Appellees= Motions for Rehearing Overruled; Opinion of June 2, 2005
Withdrawn; Affirmed in Part; Reversed and Remanded in Part; and Substitute
Majority Opinion filed February 23, 2006









Appellees= Motions for Rehearing Overruled; Opinion of June 2,
2005 Withdrawn; Affirmed in Part; Reversed and Remanded in Part; and Substitute
Majority Opinion filed February 23, 2006.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-00860-CV

_______________

 

LENNAR CORPORATION, LENNAR HOMES OF TEXAS LAND

AND CONSTRUCTION, LIMITED, AND LENNAR HOMES OF TEXAS
SALES AND MARKETING, LIMITED D/B/A VILLAGE BUILDERS, Appellants

 

V.

 

GREAT AMERICAN INSURANCE COMPANY,


AMERICAN DYNASTY SURPLUS LINES INSURANCE COMPANY, 

MARKEL AMERICAN INSURANCE COMPANY, 

GERLING AMERICA INSURANCE COMPANY, RLI INSURANCE
COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA 

AND WESTCHESTER FIRE INSURANCE COMPANY, Appellees

                                                                                                                                               


On Appeal from the 270th District Court

Harris County, Texas

Trial Court Cause No. 00‑30034

                                                                                                                                               


 

S U B S T I T U
T E   M A J O R I T Y   O P I N I O N

We overrule appellees= motions for rehearing.  We withdraw our opinion dated
June 2, 2005 and issue this substitute majority opinion.








This case involves an insurance coverage dispute over whether
the insured homebuilders are covered under six commercial general liability (ACGL@) policies for damages resulting from
their application of defective stucco material to numerous homes.  Appellants, Lennar Corporation, Lennar Homes
of Texas Land and Construction, Limited, and Lennar Homes of Texas Sales and
Marketing, Limited, d/b/a Village Builders (collectively ALennar@) are the insureds.[1]  Appellees, Great American Insurance Company
and American Dynasty Surplus Lines Insurance Company (collectively AAmerican Dynasty@),[2]
Gerling America Insurance Company (AGerling@), Markel American Insurance Company
(AMarkel@), RLI Insurance Company (ARLI@), Insurance Company of the State of
Pennsylvania (AICSOP@), and Westchester Fire Insurance
Company (AWestchester@), are the insurance carriers
(collectively Athe carriers@). 
Lennar appeals the denial of its motion for summary judgment and the
grant of each carrier=s motion for summary judgment on the coverage issues.  Lennar also appeals the grant of American
Dynasty=s separate motion for summary
judgment on Lennar=s extra-contractual claims.

We affirm the denial of Lennar=s motion for summary judgment as to
all carriers.  We affirm the summary
judgments in favor of Gerling, RLI, ICSOP, and Westchester.  We reverse and remand the summary judgment on
coverage issues in favor of Great American/American Dynasty.  We reverse and remand the summary judgment in
favor of Markel.  We affirm the summary
judgment in favor of Great American/American Dynasty on Lennar=s extra-contractual claims.

 








I. 
Background

From early 1996 through late 1999, Lennar built more than 400
homes in the Houston area with a synthetic stucco called Exterior Insulation
and Finish System (AEIFS@). According to Lennar, the manufacturers of EIFS marketed it
as an ideal product for wood-framed homes. 
However, Lennar contends it later discovered that EIFS is defectively
designed such that it traps water behind it and does not allow the water to
drain.  Consequently, the trapped water
can cause damage, such as wood rot, mold, and termite infestation, among other
problems, to other parts of the home.

Through the spring of 1999, Lennar had received a few
complaints from homeowners about EIFS-related problems.  In the spring of 1999, the complaints
increased after television programs regarding EIFS aired.  According to Lennar, it initially accepted
the manufacturer=s position that the problems were caused by installation
error and/or were typical of wood-framed homes. 
Therefore, Lennar addressed these complaints on an individual
basis.  However, by September 1999, after
spending the summer responding to complaints, 
Lennar became convinced EIFS is a defective product.

Thereafter, Lennar removed the EIFS from all the homes and
replaced it with a traditional stucco.[3]  According to Lennar, it also repaired
resulting water damage to the homes although the extent to which any homes
sustained damage is disputed.  Lennar
then sought indemnification for all its replacement and repair costs from the
carriers.  The carriers refused to
indemnify Lennar for the EIFS claims contending there is no coverage under
their policies.[4]








Lennar sued the carriers requesting a declaratory judgment
that they have a duty to indemnify Lennar for the EIFS claims and alleging breach
of contract and violations of former article 21.55 of the Texas Insurance Code
based on the carriers= refusal to indemnify. 
In addition, Lennar asserted extra-contractual claims against American
Dynasty only.  Lennar and each carrier
filed a motion for summary judgment on the coverage issues.  The trial court denied Lennar=s motion and granted all the carriers= motions.  American Dynasty also filed a motion for
summary judgment on Lennar=s extra-contractual claims, and the trial court granted the
motion.[5]

II. 
The Issues and Our Review

In its first issue, Lennar contends the trial court erred by
denying Lennar=s motion for summary judgment because
Lennar established coverage under all the policies.  Alternatively, in its second issue, Lennar
contends the trial court erred by granting the carriers= motions for summary judgment because
there was, at least, a genuine issue of material fact on whether coverage
exists under all the policies.  In its
third issue, Lennar contends  the trial
court erred by granting American Dynasty=s motion for summary judgment on
Lennar=s extra-contractual claims.  In its fourth issue, Lennar contends Texas
law applies to this dispute.








Well‑settled principles govern review of summary
judgments in insurance coverage disputes. 
See State Farm Fire & Cas. Co. v. Vaughan, 968 S.W.2d 931,
933 (Tex. 1998) (per curiam).[6]  To prevail on a traditional motion for
summary judgment, the movant must establish there is no genuine issue of
material fact so that the movant is entitled to judgment as a matter of
law.  Tex.
R. Civ. P. 166a(c); Fort Worth Osteopathic Hosp., Inc. v. Reese,
148 S.W.3d 94, 99 (Tex. 2004).  To
prevail on a no-evidence motion for summary judgment, the movant must establish
that Aafter adequate time for discovery,
there is no evidence of one or more essential elements of a claim or defense on
which an adverse party would have the burden of proof at trial.@ 
Tex. R. Civ. P. 166a(i); Reese,
148 S.W.3d at 99.  To defeat a
no-evidence motion, the nonmovant must produce more than a scintilla of
evidence raising a genuine issue of material fact.  Tex.
R. Civ. P. 166a(i); Reese, 148 S.W.3d at 99.[7]  When, as here, a trial court=s order granting summary judgment
does not specify the grounds relied upon, we must affirm summary judgment if
any of the grounds are meritorious.  FM
Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872B73 (Tex. 2000).  Finally, when both parties move for summary
judgment and the trial court grants one motion and denies the other, we must
review both parties= summary‑judgment evidence, determine all issues
presented, and render the judgment that the trial court should have
rendered.  Id. at 872.

Lennar filed one motion for summary judgment as to all the
carriers.  However, each of the six carriers
filed its own motion for summary judgment and response to Lennar=s motion for summary judgment.  Therefore, in effect, we have six separate
cross-motions for summary judgment to review on the coverage issues.  However, the dispute with respect to each
cross-motion follows a typical framework for insurance coverage litigation.








Interpretation of insurance contracts is governed by the same
rules as interpretation of other contracts. 
Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 823 (Tex.
1997); Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex.
1994).  When construing a contract, the
court=s primary concern is to give effect
to the written expression of the parties= intent.  Forbau, 876 S.W.2d at 133.  We construe an unambiguous insurance policy
as a matter of law.  Am. Mfrs. Mut.
Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003).   Further, the duty to indemnify is triggered
by the actual facts establishing the insured=s liability in the underlying suit.  Cowan, 945 S.W.2d at 821.

Generally, an insured bears the initial burden to prove the
claims against it fall within the scope of coverage afforded by the policy=s initial Ainsuring agreement.@ 
Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130
S.W.3d 181, 193 (Tex. App.CHouston [14th Dist.] 2003, pet. denied); Evergreen Nat=l Indem. Co. v. Tan It All, Inc., 111 S.W.3d 669, 675 (Tex. App.CAustin 2003, no pet.).  Then, the insurer bears the burden to prove
an exclusion or other avoidance of coverage. 
Comsys, 130 S.W.3d at 193; Tan It All, 111 S.W.3d at 675; see
Act of May 27, 1991, 72nd Leg., R.S., ch. 242, ' 11.03, 1991 Tex. Gen. Laws 939, 1046
(repealed and recodified 2003) (current version at Tex. Ins. Code Ann. ' 554.002 (Vernon Supp. 2005)).  Lennar asserts it is entitled to coverage
for  the EIFS claims because it was Alegally obligated to pay . . .
damages because of . . . >property damage= . . . caused by an >occurrence=@ as required by the initial Ainsuring agreement@ of all the policies.[8]  However, all the carriers dispute that there
was an Aoccurrence@ and Aproperty damage@ as defined in the policies.  Then, each carrier asserts various
exclusions, conditions precedent, or other grounds to defeat coverage under its
respective policy.








First, we will address the Aoccurrence@ and Aproperty damage@ issues because they are common to
all carriers.[9]   Then, we will review the cross-motions for
summary judgment as to each carrier. 
Finally, we will review American Dynasty=s motion for summary judgment on
Lennar=s extra-contractual claims.

III.  AOccurrence@ Under Texas
Law

AOccurrence@ is defined in the policies as Aan accident, including continuous or
repeated exposure to substantially the same general harmful conditions.@ 
AAccident@ is not defined in the policies.  However, the Texas Supreme Court has stated
that an injury is accidental if A>from the viewpoint of the insured,
[it is] not the natural and probable consequence of the action or occurrence
which produced the injury;  or in other
words, if the injury could not reasonably be anticipated by insured, or would
not ordinarily follow from the action or occurrence which caused the injury.=@ 
See Mid‑Century Ins. Co. v. Lindsey, 997 S.W.2d 153, 155
(Tex. 1999) (quoting Republic Nat=l Life Ins. Co. v. Heyward, 536 S.W.2d 549, 557
(Tex.1976)).  Two factors bear on the
determination of whether an insured=s action constitutes an accident: (1)
the insured=s intent, and (2) the reasonably
foreseeable effect of its conduct.  See
id.

Within this framework, the Texas Supreme Court has construed Aaccident@ to include the negligent acts of the
insured causing damage which is undesigned and unexpected.  Cowan, 945 S.W.2d at 828; Massachusetts
Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396, 400
(Tex. 1967).  In contrast, when the
action taken is an intentional tort, there is no accident, regardless of
whether the results are unintended or unexpected.  Lindsey, 997 S.W.2d at 155;Cowan,
945 S.W.2d at 827B28; Argonaut Southwest Ins. Co. v. Maupin, 500 S.W.2d
633, 635B36 (Tex. 1973); see Harken Exploration
Co. v. Sphere Drake Ins. PLC, 261 F.3d 466, 472 (5th Cir. 2001).  In sum, there is an accident when an action
is intentionally taken, but negligently performed, and the effect is not the
intended or expected result had the action been performed non-negligently.  Harken, 261 F.3d at 472B73 (citing Cowan, 945 S.W.2d
at 828; Orkin, 416 S.W.2d at 400).








Here, Lennar contends its defective construction constitutes
an Aoccurrence@ because the uncontroverted evidence
shows the resulting Aproperty damage@ was unintended and unexpected.  In response, the carriers primarily contend
that under Texas law, defective construction cannot constitute an Aoccurrence@ as a matter of law.  The carriers point out that any Aproperty damage@ was solely to Lennar=s own workCthe homes.  The carriers reason that damage to an insured=s own work is economic loss sounding
in contract only, and a breach of contract is not an Aoccurrence.@ 
In an interrelated argument, they assert that a CGL policy is not meant
to function as a performance bond and indemnify an insured for the costs to
repair and replace its own work caused by its failure to properly perform its
construction contract.[10]  The carriers also suggest Lennar=s defective construction does not
constitute an Aoccurrence@ in this case.

We find that Texas law is unsettled on whether defective
construction can constitute an Aoccurrence.@  We conclude that
under the standard CGL policy, negligently created, or inadvertent, defective
construction resulting in damage to the insured=s own work which is unintended and
unexpected can constitute an Aoccurrence.@  We further conclude
that Lennar=s defective construction constitutes
an Aoccurrence@ in this case.

A.        Texas
Law Is Unsettled On Whether Defective Construction Resulting In Damage To The
Insured=s Work Can Constitute An AOccurrence.@








Several Texas appellate courts and federal courts applying
Texas law have rendered seemingly conflicting decisions on whether defective
construction resulting in damage to the insured=s work can constitute an Aoccurrence@ under a CGL policy.[11]  We have not addressed, and the Texas Supreme
Court has not resolved, this issue.  In
fact, based on this conflict, the Texas Supreme Court recently accepted a
certified question on this issue from the Fifth Circuit.  See Lamar Homes, Inc. v. Mid‑Continent
Cas. Co., 428 F.3d 193 (5th Cir. 2005).

1.         The Carriers= Cases

The carriers cite several cases applying Texas law in support
of their contention that defective construction cannot constitute an Aoccurrence@ as a matter of law.  For example, in Hartrick v. Great American
Lloyds Insurance Co., the court held that the insured=s defective construction of a home=s foundation, which resulted in
structural problems and damage to the home, did not constitute an Aoccurrence.@ 
62 S.W.3d 270, 276B78 (Tex. App.CHouston [1st Dist.] 2001, no pet.).  The court reasoned that the insured=s voluntary and intentional conduct
was its breach of implied warranties by failing to properly prepare the soil
and failing to construct a sufficient foundation, and the damage to the home
was the reasonably foreseeable result of this conduct.  See id. at 277; see also
Malone v. Scottsdale Ins. Co., 147 F. Supp. 2d 623, 627B28 (S.D. Tex. 2001) (finding insured
builder=s alleged failure to construct
improvements according to plans and specifications was not an Aoccurrence@ because the conduct was voluntary
and intentional); Devoe v. Great Am. Ins., 50 S.W.3d 567, 572 (Tex. App.CAustin 2001, no pet.) (finding
insured=s allegedly deficient construction
and failure to complete a home on time was not an Aoccurrence@ because the construction was
voluntary and intentional even if the resulting, poorly constructed home was
unexpected, unforeseen, or unintended).








On one hand, Hartrick, Malone, and Devoe
seem somewhat limited to their facts because the insureds engaged in
substandard construction practices or failed to follow architectural or
engineering specifications, from which it could be inferred that they intended
or expected the resulting damage.  See
generally, Hartrick, 62 S.W.3d at 276B78; Malone, 147 F. Supp. 2d at
627B28; Devoe, 50 S.W.3d at 569B72. 
On the other hand, at least Hartrick and Devoe seem to
suggest that defective construction cannot constitute an Aoccurrence@ in general because the construction
is voluntary and intentional and the resulting damage is reasonably expected
even if the insured did not intend or expect the damage.  See Hartrick, 62 S.W.3d at 277B78; Devoe, 50 S.W.3d at 571B72.[12]








However, the carriers also cite Jim Johnson Homes, Inc. v.
Mid‑Continent Casualty Co., in which the court did seem to make a
blanket holding that defective construction resulting in damage to the insured=s work cannot constitute an Aoccurrence@ as a matter of law.  244 F. Supp. 2d 706, 714B19 (N.D. Tex. 2003).  In Jim Johnson Homes, the underlying
claimants complained of numerous deficiencies by the insured during
construction of their home which resulted in the insured=s abandoning the project and the
claimants= terminating the contract; the
claimants alleged breach of contract, DTPA violations, fraud, and negligence.  Id. at 710B12. 
The court held that the insurer had no duty to defend or indemnify the
insured because there was no Aoccurrence.@  Id. at 714B19. 
The court reasoned that despite the negligence allegations, the gist of
the claimants= complaint was breach of contract
based on the insured=s failure to properly perform the contract.  See id.  The court stated that the purpose of a
liability policy is to protect the insured from liability for Aproperty damage@ caused by the insured=s product, but not for replacement or
repair of the insured=s product.  See id.
at 714B15.[13]  The court further stated that a liability
policy is not meant to function as a performance bond and ensure that the
insured will perform its construction contract in a workmanlike manner and in
accordance with the terms of the contract.  See id. at 715.

Recently, another federal court expanded on the Jim
Johnson Homes court=s theory that an insured=s defective construction resulting in
damage to its work cannot constitute an Aoccurrence@ because the claim sounds in contract
only.  See Lamar Homes, Inc. v. Mid‑Continent
Cas. Co., 335 F. Supp. 2d 754, 758B60 (W.D. Tex. 2004), question
certified by Lamar Homes, Inc. v. Mid‑Continent Cas. Co., 428 F.3d
193 (5th Cir. 2005) (citing Jim Johnson Homes, 244 F. Supp. 2d at
714).  The court noted that the Texas
Supreme Court has adopted the Aeconomic loss@ doctrine: although the acts of a party may breach duties
simultaneously in tort and contract, the nature of the injury determines which
duty is breached; when the only injury is economic loss to the subject of the
contract, a cause of action sounds in contract alone.  Id. at 758B59 (citing Jim Walter Homes, Inc.
v. Reed, 711 S.W.2d 617, 618 (Tex. 1986)). 
The court opined that based on the economic loss doctrine, the Texas
Supreme Court would hold that a breach of contract is not an Aoccurrence.@ 
See id. at 759B60 (citing Jim Walter Homes, 711 S.W.2d at 618); see
also Gibson & Assoc., Inc. v. Home Ins. Co., 966 F. Supp. 468, 474
(N.D. Tex. 1997) (same).[14]

2.         Lennar=s Cases








In contrast, several courts applying Texas law have concluded
that defective construction resulting in damage to the insured=s own work can constitute an Aoccurrence@ if the resulting damage is
unintended and unexpected.  For example,
Lennar cites Great Am. Insurance Co. v. Calli Homes, Inc., in which the
court found that the insured=s improper construction of the claimants= home, including the improper
installation of EIFS, that caused various damages to the home alleged an Aoccurrence.@ 
236 F. Supp. 2d 693, 695B702 (S.D. Tex. 2002). 
The court held that claims arising from negligently created, or
inadvertent, construction defects allege an Aoccurrence@ leaving coverage to be determined by
the construction-specific exclusions in the policy.  Id. at 699B700. 
The court stated that the consequences of negligently created, or
inadvertent, construction defects are accidental, reasoning that although the
work was voluntarily and intentionally performed, it was undertaken with the
intent to perform properly.  Id.








More recently, a Texas appellate court held that an insured
builder=s negligence resulting in damage to
its work can constitute an Aoccurrence.@  See Gehan Homes,
Ltd. v. Employers Mut. Cas. Co., 146 S.W.3d 833, 843 (Tex. App.CDallas 2004, pet. filed).  The court specifically disagreed with Jim
Johnson Homes and stated that the relevant inquiry is not whether the
insured damaged its own work, i.e. the subject of the contract, but whether the
damage was unintended and unexpected.  Id.;
see CU Lloyd=s of Texas v. Main Street Homes, 79 S.W.3d 687, 690B95 (Tex. App.CAustin 2002, no pet.) (finding
homeowner=s claim against builder for
foundation defects caused by reliance on inaccurate soil survey alleged an Aoccurrence@);[15]
see also First Tex. Homes Inc. v. Mid‑Continent Cas. Co., No. 3‑00‑CV‑1048‑BD,
2001 WL 238112, at *3 (N.D. Tex. Mar. 7, 2001) (not designated for
publication), aff=d,
No. 01-10467, 2002 WL 334705 (5th Cir. 2002) (rejecting argument that damage to
insured=s work cannot constitute an Aoccurrence@ because paramount consideration is
whether damage was unintended and unexpected).[16]  For the reasons explained below, we agree
that the relevant inquiry is not whether the insured damaged its own work,
i.e., whether the claim sounds in contract only, but whether the damage is
unintended and unexpected.

B.        Defective Construction Resulting In
Damage To The Insured=s Work Can Constitute An AOccurrence.@

The principle
that a CGL policy does not generally cover the insured=s defective construction resulting in damage to its
own work is commonly known as the Abusiness
risk@ doctrine.  See
O=Shaughnessy v. Smuckler Corp., 543 N.W.2d 99, 102B03
(Minn. App. 1996), abrogated on other grounds by Gordon v. Microsoft Corp.,
645 N.W.2d 393 (Minn. 2002); Grinnell Mut. Reinsurance Co. v. Lynne, 686
N.W.2d 118, 123B25 (N.D. 2004); see also James Duffy O=Connor, What Every Construction Lawyer Should Know
About CGL Coverage For Defective Construction, 21‑WTR Constr. Law 15 (2001).  A passage from a New Jersey case has been
cited by many courts to explain the Abusiness
risk@ doctrine:








The risk intended to be insured [by
the CGL policy] is the possibility that the goods, products or work of the
insured, once relinquished or completed, will cause bodily injury or damage to
property other than to the product or completed work itself, and for which the
insured may be found liable.  The
insured, as a source of goods or services, may be liable as a matter of
contract law to make good on products or work which is defective or otherwise
unsuitable because it is lacking in some capacity.  This may even extend to an obligation to
completely replace or rebuild the deficient product or work.  This liability, however, is not what the
coverages in question are designed to protect against.  The coverage is for tort liability for
physical damages to others and not for contractual liability of the insured for
economic loss because the product or completed work is not that for which the
damaged person bargained.

Weedo v. Stone‑E‑Brick, Inc., 405 A.2d 788, 791 (N.J. 1979).  Therefore, this doctrine recognizes that the
consequences of poor workmanship are generally a Abusiness risk@ to be borne by the insured as
opposed to an insurable risk.  Id. at
791B92; see O=Shaughnessy, 543 N.W.2d at 102B03; Lynne, 686 N.W.2d at 123B25; Jotham D. Pierce, Jr., Allocating
Risk Through Insurance And Surety Bonds, 425 PLI/Real 193, 197B98 (1998).

Here, the carriers generally rely on the Abusiness risk@ doctrine to argue that defective
construction cannot constitute an Aoccurrence.@ 
However, we conclude that defective construction can constitute an Aoccurrence@ under the standard CGL policy
because (1) coverage for Abusiness risks@ is ordinarily eliminated through
exclusionsCnot through the Aoccurrence@ requirement in the initial Ainsuring agreement@; and (2) coverage for some Abusiness risks@ is not eliminated when the
damaged work, or the work out of which the damage arose, was performed by
subcontractors.

1.         The AInsuring Agreement@ and the ABusiness Risk@ Exclusions








 First, coverage for Abusiness risks@ is ordinarily eliminated through
exclusionsCnot through the Aoccurrence@ requirement in the initial Ainsuring agreement.@  The initial Ainsuring agreement@ is a broad statement of coverage.  See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,
673 N.W.2d 65, 74 (Wis. 2004).[17]  The Ainsuring agreement@ contains no language categorically
eliminating coverage for damage to the insured=s own work, i.e. a claim sounding in
contract.  See id. at 77 n.6.  There is no tort/contract demarcation in the Ainsuring agreement,@ and Aoccurrence@ is not defined by reference to the
legal category of the claim.  Id. at
77.  Instead, Aoccurrence@ is defined as an Aan accident, including continuous or
repeated exposure to substantially the same general harmful conditions.@

The Texas Supreme Court has not held that a claim sounding in
contract cannot constitute an accident under the initial Ainsuring agreement.@ 
The court has applied the economic loss doctrine to determine what
damages a claimant is entitled to recover.  See Jim Walter Homes, 711 S.W.2d at 617B18 (holding claimants not entitled to
exemplary damages for defendant=s failure to properly construct their home because claim
sounded in contract only); see also Southwestern Bell Tel. Co. v.
DeLanney, 809 S.W.2d 493, 494B95 (Tex. 1991) (holding claimant
could not recover in tort when only damage resulting from defendant=s breach of contract was to the
subject of the contract).  However, the
court has not applied the economic loss doctrine to determine whether an
insured=s action constitutes an accident
under a CGL policy; Jim Walters Homes and Delanney did not
involve insurance coverage. See Jim Walter Homes, 711 S.W.2d at 617B18; Delanney, 809 S.W.2d at
494B95; see also Am. Girl, 673
N.W.2d at 75 (clarifying Aeconomic loss@ doctrine is a remedies principle which determines whether a
loss can be recovered in tort or in contract; it does not determine coverage
under an insurance policy which depends instead upon the policy language).








Rather, the court has instructed that we examine the insured=s intent and the reasonably
foreseeable effect of its conduct.  See
Lindsey, 997 S.W.2d at 155.  Within
this framework, Aaccident@ includes an insured=s negligent acts causing damage which
is undesigned and unexpected.  Cowan,
945 S.W.2d at 828; Orkin, 416 S.W.2d at 400.  However, the court has not equated negligent
acts as constituting an Aaccident@ with negligence as a form of legal liability.  See Cowan, 945 S.W.2d at 826B28; Orkin, 416 S.W.2d at 400; see
also Harken, 261 F.3d at 472B73. 
Instead, the court has held that negligent acts constitute an accident
to distinguish negligent acts from intentional torts.  See Cowan, 945 S.W.2d at 826B28; see also Harken, 261 F.3d
at 472B73. 
In fact, in Jim Walters Homes, the court recognized that one may
negligently, as opposed to intentionally, breach a contract although the
claimant is ultimately restricted to breach of contract remedies.  See 711 S.W.2d at 618.  Further, we consider whether the damage was
unintended and unexpectedCnot whose work was damaged. 
Lindsey, 997 S.W.2d at 155; Cowan, 945 S.W.2d at 828; Orkin,
416 S.W.2d at 400; see Harken, 261 F.3d at 472B73.[18]  Accordingly, the Aaccident@ framework established by the Texas
Supreme Court does not necessarily eliminate coverage for damage to the insured=s own work, i.e. a claim sounding in
contract.








However, the standard CGL policy contains certain Abusiness risk@ exclusions.  See Am. Girl, 673 N.W.2d at 74;
Lynne, 686 N.W.2d at 123.  Notably,
the Ayour work@ exclusion precludes coverage for Aproperty damage@ to A>your work= arising out of it or any part of it
and included in the >products completed operations hazard.=@[19]  In short, the Ayour work@ exclusion precludes coverage for Aproperty damage@ to the insured=s work arising after a construction
project is finished and in the owner=s possession.[20]  The policy also contains exclusions
precluding coverage for Aproperty damage@ to the insured=s work occurring during construction.[21]








In the cases cited here by the carriers, the courts did not
consider the effect of the Abusiness risk@ exclusions on the Aoccurrence@ analysis.  See, e.g., Lamar Homes, 335 F. Supp.
2d at 758B60; Jim Johnson Homes, 244 F.
Supp. 2d at 714B19.  Rather, Lamar
Homes and Jim Johnson Homes cited T.C. Bateson Construction Co.
v. Lumbermens Mutual Casualty Co., in which we recited the Abusiness risk@ doctrine and stated that liability
insurance is not meant to protect the insured for replacement or repair of its
own work.  See Lamar Homes, 335 F.
Supp. 2d at 759 (citing T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co.,
784 S.W.2d 692, 694B95 (Tex. App.CHouston [14th Dist.] 1989, writ denied)); Jim Johnson
Homes, 244 F. Supp. 2d at 714B15 (same).[22]  However, we based that doctrine solely on the
Abusiness risk@ exclusions, including an exclusion
for damage to the insured=s work in effect at that time; we did not address the Aoccurrence@ requirement.  See T.C. Bateson, 784 S.W.2d at 694B95.  Further, in T.C. Bateson, we, in turn,
cited Weedo when explaining the Abusiness risk@ doctrine.  See id. at 695 (citing Weedo,
405 A.2d at 791).  However, the Weedo
court also did not consider the Aoccurrence@ requirement, but, instead, based its
oft-cited Abusiness risk@ passage on the exclusions, including
an exclusion for damage to the insured=s work.  See 405 A.2d at 791B93. 
Consequently, we disagree with the Lamar Homes and Jim Johnson
Homes courts= reliance on the Abusiness risk@ doctrine as recited in T.C.
Bateson to conclude that defective construction cannot constitute an Aoccurrence.@ See Am. Girl, 673
N.W.2d at 76B77 (recognizing courts have
continually misapplied Weedo to hold that defective construction cannot
constitute an occurrence resulting in some Aregrettably overbroad@ generalizations about CGL policies).

Instead, we must read all parts of an insurance policy
together to ascertain the parties= intent and give effect to all parts,
so that none will be rendered superfluous or meaningless.  See King v. Dallas Fire Ins. Co., 85
S.W.3d 185, 192B93 (Tex. 2002); Forbau, 876 S.W.2d at 133; Betco
Scaffolds Co. v. Houston United Cas. Ins. Co., 29 S.W.3d 341, 344 (Tex.
App.CHouston [14th Dist.] 2000, no
pet.).  In King, the Texas Supreme
Court expressly considered an exclusion when interpreting the initial Aoccurrence@ requirement of a CGL policy and
rejected the insurer=s interpretation of Aoccurrence@ that would render the exclusion
superfluous and meaningless.  85 S.W.3d
at 189, 192B93; see also Cowan,
945 S.W.2d at 828.

Similarly, finding no Aoccurrence@ when the insured=s defective construction damages its
own work would render the Abusiness risk@ exclusions, particularly the Ayour work@ exclusion, superfluous and
meaningless.








If . . . losses actionable in
contract are never CGL Aoccurrences@ for purposes of the initial coverage grant, then the
business risk exclusions are entirely unnecessary.  The business risk exclusions eliminate
coverage for liability for property damage to the insured=s own work or product‑‑liability
that is typically actionable between the parties pursuant to the terms of their
contract, not in tort.  If the insuring
agreement never confers coverage for this type of liability as an original
definitional matter, then there is no need to specifically exclude it.  Why would the insurance industry exclude
damage to the insured=s own work or product if the damage could never be considered
to have arisen from a covered Aoccurrence@ in the first place?

Am. Girl, 673
N.W.2d at 78.  Quite simply, coverage for
Abusiness risks@ should be eliminated through the
appropriately named Abusiness risk@ exclusions which, when applicable, directly address damage
to the insured=s own work resulting from a breach of
contract.  See Am. Girl,
673 N.W.2d at 76B78; Erie Ins. Exch. v. Colony Dev. Corp., 736 N.E.2d
941, 947B48 (Ohio Ct. App. 1999); see also
Lynne, 686 N.W.2d at 123B25.  Therefore, CGL
policies do not generally cover contract claims arising out of the insured=s defective work, but this is by
operation of the Abusiness risk@ exclusions, not because a loss actionable only in contract
can never be an Aoccurrence@ under the initial Ainsuring agreement.@ 
Am. Girl, 673 N.W.2d at 76; see Colony Dev. Corp., 736
N.E.2d at 947B48.

Accordingly, we agree with the cases cited by Lennar because
the courts recognized that the Aoccurrence@ requirement can encompass damage to the insured=s own work, and coverage then depends
upon the exclusions.  See, e.g., Calli
Homes, 236 F.Supp. 2d at 699B700 (concluding negligently created
or inadvertent, as opposed to intentional, construction defects are accidental
leaving coverage to be determined by the construction-specific exclusions); Gehan
Homes, 146 S.W.3d at 843 (stating that finding no Aoccurrence@ when the damage is to the insured=s own workCthe subject of the contractCwould read language into the policy Athat simply is not there@ and render surplusage the exclusions
that apply to Aproperty damage). 

 








2.         The
Subcontractor Exception

More significantly, coverage for some Abusiness risks@ is not eliminated when the
damaged work, or the work out of which the damage arose, was performed by
subcontractors.  See Am. Girl, 673
N.W.2d at 82B84; O=Shaughnessy, 543 N.W.2d at 103B05; Colony Devel. Corp., 736
N.E.2d at 948B49. 
Specifically, the standard Ayour work@ exclusion now contains a
subcontractor exception which provides that the exclusion Adoes not apply if the damaged work or
the work out of which the damage arises was performed on [your] behalf by a
subcontractor.@[23]








It is important to understand the evolution of the
subcontractor exception.  In the past,
the Abusiness risk@ exclusions operated collectively to
preclude coverage for any damage to construction projects, including damage to
the work of subcontractors, or damage arising out of the work of
subcontractors.  See Am. Girl, 673
N.W.2d at 82; O=Shaughnessy, 543 N.W.2d at 103; Clifford J. Shapiro, Further
Reflections-Inadvertent Construction Defects Are An AOccurrence@ Under Commercial General Liability
Policies, 686 PLI/Lit 73, 82 (2003).  Many contractors were unhappy with this
situation because more projects were being completed using subcontractors.  See Am. Girl, 673 N.W.2d at 82.  In 1976, the insurance industry began to
offer, for an additional premium, an endorsement to the CGL policy known as the
Broad Form Property Damage Endorsement (ABFPD@).  See id.; Shapiro, 686 PLI/Lit at 82.  The BFPD deleted several portions from the Abusiness risk@ exclusions and replaced them with
more specific exclusions that effectively broadened coverage.  See Am. Girl, 673 N.W.2d at 83; Shapiro,
686 PLI/Lit at 82B84. 
Among other changes, the BFPD narrowed the Ayour work@ exclusion and extended coverage for Aproperty damage@ to the work of a subcontractor or Aproperty damage@ arising out of the work of a
subcontractor.  See Mid‑United
Contractors, Inc. v. Providence Lloyds Ins. Co., 754 S.W.2d 824, 827 (Tex.
App.CFort Worth 1988, writ denied); Am.
Girl, 673 N.W.2d at 82B83; Shapiro, 686 PLI/Lit
at 84.  In 1986, the insurance industry
incorporated this aspect of the BFPD directly into the CGL policy by inserting
the subcontractor exception in the Ayour work@ exclusion.  See Am. Girl, 673 N.W.2d at 83; O=Shaughnessy, 543 N.W.2d at 103B04; Shapiro, 686 PLI/Lit at 85; O=Connor, 21‑WTR Constr. Law. at 16 n.5.[24]

In T.C. Bateson and Weedo, the courts recited
the Abusiness risk@ doctrine based on a Ayour work@ exclusion in the earlier version of
the CGL policy, which did not contain a subcontractor exception.  See T.C. Bateson, 784 S.W.2d at 694B95; Weedo, 405 A.2d at
791.  Therefore, the Abusiness risk@ doctrine as recited in T.C.
Bateson and Weedo has been modified by the subcontractor exception
and cannot be relied on to defeat coverage for all defective construction.  See O=Shaughnessy, 543 N.W.2d at 103B04 (recognizing cases interpreting
pre-1986 CGL policy no longer apply); Shapiro, 686 PLI/Lit at 87 (stating most courts have failed to consider
the history of CGL exclusions when determining whether construction defects
constitute an Aoccurrence@).








Instead, the subcontractor exception demonstrates insurers
intended to cover some defective construction resulting in damage to the
insured=s work.  See O=Shaughnessy, 543 N.W.2d at 104 (stating Ait would be willful and perverse . .
. to simply ignore@ the subcontractor exception that is Aan affirmative statement on the part
of those who drafted the policy@ and Awas intended to narrow the >business risk= doctrine@); O=Connor, 21‑WTR Constr. Law. at 15B16 (stating Abusiness risk@ doctrine should not bar some
defective construction coverage that was intended by drafters of the policy and
deemed important enough for insureds to pay millions in premiums).  Accordingly, finding no occurrence for
defective construction resulting in damage to the insured=s work would render the subcontractor
exception superfluous and meaningless.  See, e.g., Am. Girl, 673 N.W.2d at 78
(recognizing subcontractor=s work can give rise to Aproperty damage@ caused by an Aoccurrence@); Lee Builders, Inc. v. Farm
Bureau Mut. Ins. Co., 104 P.3d 997, 1001B03 (Kan. Ct. App. 2005) (finding that
defective materials or workmanship which caused unintended water damage to
insured=s project was an Aoccurrence@ under broad Ainsuring agreement@ and that construing Aoccurrence@ more narrowly would render
subcontractor exception meaningless);[25]
see also Shapiro, 686 PLI/Lit
at 85 (stating subcontractor exception demonstrates Aproperty damage@ to a construction project arising
from subcontractor=s work is an Aoccurrence@).[26]








Finally, we reject the carriers= argument that allowing defective
construction to constitute an Aoccurrence@ will transform a CGL policy into a performance bond.  As we will discuss, the Ainsuring agreement@ covers Adamages because of . . . >property damage= . . . caused by an >occurrence.=@ 
Therefore, although defective construction may constitute an Aoccurrence,@ the insurer indemnifies the insured
only for resulting Aproperty damage@ arising after the project is
completed.[27]  In contrast, a performance bond is broader
than a CGL policy in that it guarantees Athe completion of a construction
contract upon the default of the general contractor.@ 
Black=s Law
Dictionary 1158 (7th ed.
1999); see Florida Bd. of Regents v. Fid. & Deposit Co. of Maryland,
416 So.2d 30, 32 (Fla. Dist. Ct. App. 1982), rejected on other grounds by
Fed. Ins. Co. v. Southwest Florida Ret. Ctr., Inc., 707 So.2d 1119 (Fla.
1998) (stating purpose of performance bond is to ensure completion of the work
upon contractor=s default and insure against any losses the owner may suffer
if default occurs).  Therefore, a Avariety of deficiencies that do not
constitute >property damage= may be covered by a performance
bond, and not all deficiencies cause additional property damage.@  O=Shaughnessy, 543 N.W.2d at 105.  Consequently, allowing coverage for some Aproperty damage@ resulting from defective
construction does not transform a CGL policy into a performance bond and
require a CGL carrier to pay anytime an insured fails to complete, or otherwise
comply with, its contract.[28]








However, to the extent our holding does give a CGL policy
some aspects of a performance bond, we are, nonetheless, bound by the language
of the current policy.  The carriers= Aperformance bond@ rationale is a rehash of the Abusiness risk@ doctrine, which is enforced through
the exclusions, when applicable.  See
Colony Devel. Corp., 736 N.E.2d at 947 (recognizing general proposition
that liability policy is not a performance bond, but rationale is not that
negligent construction falls outside broad insuring agreement, but that damages
are usually excluded by the standard exclusions).  Therefore, the Aperformance bond@ rationale has been modified by the
subcontractor exception.  As one court
explained:

[T]he [insurance] industry chose to
add the [subcontractor] exception to the [Ayour work@] exclusion in 1986. . . .  We realize that under our holding a general
contractor who contracts out all the work to subcontractors . . . can ensure
complete coverage for faulty workmanship. 
However, it is not our holding that creates this result: it is the addition
of the new language to the policy.  We
have not made the policy closer to a performance bond for general contractors,
the insurance industry has.

Kalchthaler v. Keller Constr. Co., 591 N.W.2d 169, 174 (Wisc. Ct. App. 1999).  Consequently, we reject the carriers= attempt to circumvent the
subcontractor exception by urging that a Aperformance bond@ rationale negates an occurrence in
the first place.  See Lee
Builders, 104 P.3d at 1003 (rejecting insurer=s Aperformance bond@ argument to negate an Aoccurrence@ because Aperformance bond@ rationale was based on Ayour work@ exclusion that predated
subcontractor exception).

In sum, reading the standard CGL policy as a whole, we hold
that negligently created, or inadvertent, defective construction resulting in
damage to the insured=s own work that is unintended and unexpected can constitute
an Aoccurrence.@ 
Nonetheless, the Ayour work@ or other Abusiness risk@ exclusions may preclude coverage for the damage.  However, in some instances, coverage will be
restored if the damaged work, or the work out of which the damage arose, was
performed by subcontractors.[29]








C.        Lennar=s Defective
Construction Constitutes an AOccurrence.@

Although the carriers primarily contend that defective
construction cannot constitute an Aoccurrence@ as a matter of law, they also
suggest that Lennar=s defective construction is not an Aoccurrence@ in this case.  They assert there is no accident because
Lennar voluntarily and intentionally constructed the homes with EIFS even if
the resulting damage was unintended and unexpected.  The carriers cite Hartrick and Devoe
in which the courts found there was no occurrence because the insured=s construction was voluntary and
intentional even if the resulting damage was unintended and unexpected.  See Hartrick, 62 S.W.3d at 277B78 (citing Lindsey, 997 S.W.2d
at 155); Devoe, 50 S.W.3d at 571B72 (citing Maupin, 500 S.W.2d
at 633).








The Texas Supreme Court has stated that an injury caused by
voluntary and intentional conduct is not an accident just because Athe result or injury may have been
unexpected, unforeseen, and unintended@; however, the court has made this
statement with respect to intentional torts.  See Lindsey, 997 S.W.2d at 155
(quoting Maupin, 500 S.W.2d at 635); see also Harken, 261 F.3d at
472.  The court has explicitly rejected
the suggestion that Aif an actor intended to engage in the conduct that gave rise
to the injury, there can be no >accident.=@  See Lindsey, 997 S.W.2d at 155; Cowan,
945 S.W.2d at 828; see also Harken, 261 F.3d at 472.  Adopting such an approach Awould render insurance coverage
illusory for many of the things for which insureds commonly purchase insurance.@ 
See Cowan, 945 S.W.2d at 828 (providing example that there
is an accident when a hunter shoots at what he believes is a deer but is
actually a person; although firing the gun was intentional, the harm can be
characterized as accidental). Instead, there is an Aoccurrence@ if an action is intentionally taken,
but negligently performed, and the effect is not the intended or expected
result had the action been performed non-negligently.  Harken, 261 F.3d at 472B73 (citing Cowan, 945 S.W.2d
at 828; Orkin, 416 S.W.2d at 400).

Here, the uncontroverted evidence demonstrates Lennar did not
intend to build the homes with a defective product and did not intend or expect
the resulting damage.  Daris Horn, Lennar=s Customer Care Specialist who
handled the EIFS claims, averred by affidavit that when Lennar decided to use
EIFS in the early 1990=s, the EIFS manufacturers marketed it as an improved form of
stucco that was easy to install, Alow maintenance,@ and ideal for residential,
wood-framed homes.  Horn further averred
that Lennar was unaware EIFS was defective while Lennar was constructing the
EIFS homes; instead, Lennar first recognized EIFS was defective in September
1999, approximately the same time it stopped using EIFS. Consequently, Lennar=s construction of the homes with a
defective product was inadvertent or, at most, negligent because it was unaware
of the defect.  Further, the damage was
not the intended or expected resulted had the homes been properly constructed,
i.e. without a defective product. 
Accordingly, Lennar=s defective construction constitutes an Aoccurrence@ under Texas law.

IV. 
AOccurrence@ Under
Florida Law

American Dynasty argues that Florida law applies to the Aoccurrence@ issue under its policy.  The party asserting application of foreign
law bears the burden to first show a true conflict of laws and then demonstrate
which law should apply.  Weatherly v.
Deloitte & Touche, 905 S.W.2d 642, 650 (Tex. App.CHouston [14th Dist.] 1995, writ dism=d w.o.j.), leave granted, mand.
denied, 951 S.W.2d 394 (Tex. 1997). 
American Dynasty asserts there is a conflict between Florida and Texas
law because Florida law is well-settled that defective construction cannot constitute
an Aoccurrence.@ 
We disagree.  To the extent the
issue may have been settled when American Dynasty filed its brief, it has since
become unsettled.








American Dynasty cites LaMarche v. Shelby Mutual Insurance
Co., in which the Florida Supreme Court stated that a CGL policy does not
cover a insured contractor=s costs to replace or repair defective workmanship and
materials.  390 So.2d 325, 326B27 (Fla. 1980).  However, the court did not consider whether
the defective workmanship was an Aoccurrence@; instead, the court based its
holding on Weedo and the Abusiness risk@ exclusions in the pre-1986 policy,
including an exclusion for damage to the insured=s work that did not contain a
subcontractor exception.  See id.
at 326B27. 
Nonetheless, several intermediate Florida appellate courts have cited LaMarche
when holding that defective construction is not an Aoccurrence@ under the current CGL policy even if
the work was performed by subcontractors; these courts have reasoned that an
exception to an exclusion cannot create coverage where none exists in the first
place.  See, e.g., Lassiter Constr.
Co. v. Am. States Ins. Co., 699 So.2d 768, 770 (Fla. Dist. Ct. App. 1997); Home
Owners Warranty Corp. v. Hanover Ins. Co., 683 So.2d 527, 529B30 (Fla. Dist. Ct. App. 1996). 

However, recently, another intermediate Florida appellate
court held that a builder=s CGL policy did cover defective construction
performed by a subcontractor.  See
J.S.U.B., Inc. v. United States Fire Ins. Co., 906 So.2d 303, 307B11 (Fla. Dist. Ct. App. 2005).  The court distinguished LaMarche, in
part, because LaMarche focused on exclusions in the pre-1986 policy,
including theAyour work@ exclusion that did not contain the
subcontractor exception.  See id.
at 307B10. 
The J.S.U.B. court held that defective construction causing
unintended and unexpected damage is an Aaccident@ and mentioned that the Ayour work@ exclusion and its subcontractor
exception, would have no meaning if defective construction was not covered
under the initial Ainsuring agreement.@ 
See id. at 308B11.








Consequently, the same conflict exists among Florida courts
as in Texas.  Therefore, American Dynasty
has not shown that Florida law differs from Texas law on the Aoccurrence@ issue, and we need not engage in a
choice of law analysis.[30]  Because Lennar contends in its fourth issue
that Texas law applies to coverage issues under the American Dynasty policy, we
sustain Lennar=s fourth issue.  Accordingly, because Texas law applies to the
Aoccurrence@ issue under all the policies,
including the American Dynasty policy, Lennar has established an Aoccurrence@ under all the policies.

V. 
AProperty Damage@

Although we have held that Lennar=s defective construction constitutes
an Aoccurrence,@ Lennar must also establish that it
paid Adamages because of . . . property
damage@ caused by the defective
construction.  AProperty damage@ is defined in the policies as A[p]hysical injury to tangible
property, including all resulting loss of use of that property.@[31]

Lennar contends all its costs are Adamages because of . . . property
damage.@ 
We disagree.  We distinguish
between three distinct categories of damages: (A) the costs to repair water
damage to the homes, which constitute Adamages because of . . . property
damage@; (B) the costs to remove and replace
EIFS as a preventative measure, which do not constitute Adamages because of . . . property
damage@; and (C) overhead costs, inspection
costs, personnel costs, and attorneys= fees, which do not constitute Adamages because of . . . property damage.@[32]








A.        Costs To Repair Water Damage 

According to the summary judgment evidence, the EIFS=s entrapment of moisture caused water
damage to at least some of the homes. 
Depending on the home, the water damage included wood rot, damage to
substrate, sheathing, framing, insulation, sheetrock, wallpaper, paint, carpet,
carpet padding, wooden trim, and baseboards, mold damage, and termite
infestation.  These damages constitute Aphysical injury to tangible property.@ 
See Am. Girl, 673 N.W.2d at 74B75 (finding insured=s faulty site preparation caused Aproperty damage@ because foundation sank causing the
rest of the building to buckle and crack). 
Consequently, Lennar=s costs to repair this water damage constitute Adamages because of . . . property
damage.@[33]

Nonetheless, the carriers claim that Lennar has not satisfied
the Aproperty damage@ requirement because it did not prove
all the homes sustained water damage. 
Lennar=s own evidence is somewhat
conflicting on whether all homes sustained water damage.[34]  In any event, we hold that Lennar=s costs to repair the homes that did
sustain water damage constitute Adamages because of . . . property
damage.@

 








B.        Removal
And Replacement Of EIFS

Lennar also contends it is entitled to indemnification for
its costs to remove and replace EIFS on all the homes.  In contrast, the carriers contend that these
costs are not covered because replacement of an initially defective product is
not Aproperty damage.@

The carriers cite North American Shipbuilding, Inc. v.
Southern Marine & Aviation Underwriting, Inc., in which the court held
that the insured shipbuilder=s replacement of initially defective welds did not constitute
Aphysical loss . . . or damage@ as required for coverage under a
builder=s risk policy.  930 S.W.2d 829, 832B34 (Tex. App.CHouston [1st Dist.] 1996, no
writ).  The court stated that the
defective welds were never in Aan initial satisfactory state that was changed by some
external event into an unsatisfactory state,@ but instead came into existence in a
damaged state.  Id. at 833B34. 
Although North American Shipbuilding involved a builder=s risk policy, we agree with
its reasoning at least with respect to its interpretation of Aproperty damage@ because it is consistent with the
definition of Aproperty damage@ in the CGL policies, which requires Aphysical injury@ to tangible property.  See Fid. & Deposit Co. of Md. v.
Hartford Cas. Ins. Co., 215 F. Supp. 2d 1171, 1183 (D. Kan. 2002) (stating
that under its plain meaning, Aphysical injury@ in CGL policy unambiguously Aconnotes . . . an alteration in
appearance, shape, color or in other material dimension@). 
Here, the EIFS was not physically injured after application to the
homes; the EIFS was not changed from a satisfactory state into an
unsatisfactory state, or otherwise physically altered.[35]  Rather, the EIFS was already in an
unsatisfactory state when applied to the homes because it is inherently
defective. Therefore, the defective EIFS does not constitute Aproperty damage.@








Nonetheless, Lennar suggests that because all the homes
sustained water damage, all its costs to fully remove and replace EIFS are Adamages because of . . . property
damage.@ 
We disagree.  Even if all the
homes experienced water damage, we cannot conclude Lennar=s costs to remove and replace all
EIFS on the homes are Adamages because of . . . property damage.@ 
To the contrary, the evidence reflects that in early 2000, Lennar
implemented a plan to remove EIFS and replace it with a traditional stucco on
all the homes regardless of whether the EIFS had caused any damage.  During the process of replacing the EIFS,
Lennar repaired some water damage on at least some of the homes.  Nevertheless, the evidence demonstrates
Lennar=s intent was to fully remove and
replace the EIFS as a preventative measure because it is defective.

Fidelity & Deposit Co. involved the dichotomy between
damages resulting from physical injury to property and costs incurred to prevent
physical injury to property.  See
215 F. Supp. 2d at 1174B84.  Fidelity issued a
performance bond for the insured contractor=s construction of a school.  Id. at 1175.  Fidelity completed construction of the school
after the school district determined the project was defective and terminated
the contractor.  Id.  Fidelity was eventually assigned all the
contractor=s rights against its liability
insurer, who denied coverage for the damages. 
Id. at 1175B76.  Fidelity argued
that based on extensive damage to the project, it had to be demolished and
rebuilt; therefore, Fidelity was entitled to indemnification under the
contractor=s liability policy for its entire
costs to rebuild the project because these costs were attributable to Aproperty damage.@ 
Id. at 1178.








The court acknowledged there was physical injury to the
project including cracked walls, blocks, joints, floor slabs, and lintels.  Id. at 1183.  The costs to repair these problems
unquestionably constituted covered Aproperty damage.@ 
Id.  However, there were
other problems which had not resulted in Aproperty damage@ but would likely have caused damage
in the future.  Id.  For instance, most of the walls had
discontinuous rebar which rendered them susceptible to cracking in the
future.  Id.  The court believed that Fidelity made a good
business decision to demolish and rebuild the project due to the potential for
extensive damage in the future.  Id.
at 1180, 1184.  However, the court was
not persuaded that such a decision would have been necessary to repair only the
physically injured property that currently existed.  Id. 
The court held that the proper measure of damages was the amount it
would have cost to repair the physically injured property.  Id. at 1184.  Therefore, Fidelity=s total damages had to be apportioned
between its consequential costs to repair physically injured property and its
costs to prevent future damage.  See
id. at 1183B84.

Similarly, here, Lennar arguably made a good business
decision to remove and replace all the EIFS to prevent further damage.  Nonetheless, considering the summary judgment
evidence, we cannot conclude that it was necessary for Lennar to remove and
replace all the EIFS in order to repair the water damage, if any, to each
home.  Therefore, the costs incurred by
Lennar to remove and replace EIFS as a preventative measure are not Adamages because of . . . property
damage.@ 
Accordingly, Lennar must apportion the EIFS-related damages between its
costs to remove and replace EIFS as a preventative measure and its costs to
repair water damage to the homes.[36]

C.        Overhead
Costs, Inspection Costs, Personnel Costs, and Attorneys= Fees








Lennar also seeks indemnification for various costs it
incurred in addressing the EIFS claims, including overhead costs, inspection
costs, personnel costs, and attorneys= fees.  Lennar argues that the carriers must
indemnify Lennar for these costs under the Ainsuring agreement@ portion of the policy.  Lennar cites Missouri Terrazzo Co. v. Iowa
Nat=l Mut. Ins. Co., in which the court held that the
insured=s liability policy covered a building
owner=s claim for dimunition in value
caused by damaged floors installed by the insured.  740 F.2d 647, 650 (8th Cir. 1984).  The court found that the dimunition in value
constituted Adamages because of . . . property
damage.@ 
See id.  Likewise, Lennar
characterizes its overhead costs, inspection costs, personnel costs, and
attorneys= fees as Adamages because of . . . property
damage.@ 
We disagree.

Lennar ignores the Alegally obligated to pay@ language in the Ainsuring agreement.@ 
The Ainsuring agreement@ provides that the carrier will pay
those sums that Lennar Abecomes legally obligated to pay as damages because of
. . . property damage.@ (emphasis added).  The
policies do not include a definition of Alegally obligated to pay.@ 
However, giving the phrase its ordinary meaning, it means an obligation
imposed by law, such as an obligation to pay pursuant to a judgment,
settlement, contract, or statute.  See
Comsys, 130 S.W.3d at 189 n.3 (recognizing a judgment is not the only
manner by which an insured can become legally obligated to pay because a legal
obligation can also arise out of a contract, such as a settlement); Tex.
Prop. and Cas. Ins. Guar. Ass=n v. Boy Scouts of Am., 947 S.W.2d 682, 691 (Tex. App.CAustin 1997, no writ) (same); see
also Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co., 100
S.W.3d 566, 574 (Tex. App.CHouston [14th Dist.] 2003, pet. denied) (recognizing courts
give terms used in an insurance contract their ordinary and generally accepted
meaning unless the policy shows the words were meant in a technical or
different sense).  While Lennar may have
been legally obligated to pay the third-party EIFS claims by replacing EIFS,
making repairs, and/or making cash payments, it was not legally obligated to
incur its own overhead costs, inspection costs, personnel costs, and attorneys= fees in connection with settling the
claims.[37]








Moreover, the insuring agreement clearly refers to the claimant=s damages that the insured becomes legally obligated to
pay.  For instance, in Missouri
Terrazzo, the dimunition in value was the measure of the building owner=s damages resulting from the damaged
floors.  See 740 F.2d at 650.  The insured paid a share of those damages
pursuant to settling the claimant=s suit.  See id. at 649.  In contrast, Lennar=s overhead costs, inspection costs,
personnel costs, and attorneys= fees are not components of the homeowners= damages.  Rather, they are Lennar=s own costs incurred in connection
with settling the EIFS claims. 
Therefore, Lennar was not legally obligated to pay these costs as Adamages because of . . . property
damage.@

In sum, Lennar=s costs to remove and replace EIFS as
a preventative measure and its overhead costs, inspection costs, personnel
costs, and attorneys= fees are not Adamages because of . . . property
damage.@ 
Consequently, the carriers have no duty to indemnify Lennar for these
costs.  However, Lennar=s costs to repair water damage to the
homes are Adamages because of . . . property
damage.@ 
Accordingly, there remains a genuine issue of material fact on the Aproperty damage@ issue because Lennar must apportion
its damages between covered damages and non-covered damages.

Having resolved the Aoccurrence@ and Aproperty damage@ issues common to all the carriers,
we will next consider each cross-motion for summary judgment.

VI. 
Gerling

Gerling is one of Lennar=s primary carriers.  Gerling issued a CGL policy, effective June
1, 1997 to June 1, 1999, with a policy limit of $1 million per Aoccurrence@ and a self-insured retention (ASIR@) of $250,000 per Aoccurrence.@








Lennar moved for summary judgment asserting that the EIFS
claims are covered under the Gerling policy because they constitute Aproperty damage@ caused by an Aoccurrence.@ 
We have already concluded that there is no coverage for Lennar=s costs to replace EIFS as a
preventative measure.  Therefore, because
there is no coverage for a portion of Lennar=s costs, the trial court properly
denied Lennar=s motion for summary judgment as to
Gerling.  However, we have determined
that Lennar=s costs to repair water damage
constitute Aproperty damage@ caused by an Aoccurrence.@ 
Therefore, we will consider Gerling=s other summary judgment grounds for
defeating coverage.  We find one ground
dispositive.

In particular, Gerling contends that it has no duty to
indemnify Lennar because Lennar cannot satisfy the SIR contained in the
policy.  The policy provides that its coverage
limits apply only in excess of the $250,000 SIR.  SIR is defined as Athe limit of insurance that the
insured agrees to assume responsibility for in attempting settlement and/or in
payment of all claims resulting from any >occurrence.=@ 
In short, Lennar must satisfy a $250,000 Adeductible@ per Aoccurrence@ before coverage is triggered under
the Gerling policy.  However, we conclude
that the EIFS claim for each home constitutes a separate Aoccurrence,@ and Lennar has not incurred damages
exceeding $250,000 for any one home.

A.        Separate AOccurrences@








Lennar contends that all the EIFS claims constitute one Aoccurrence.@ 
In contrast, Gerling contends the EIFS claim for each home constitutes a
separate Aoccurrence.@ 
Under Texas law, courts apply a Acause@ analysis to determine whether a set
of facts involves one or more Aoccurrences.@  Ran-Nan, Inc. v.
Gen. Accident Ins. Co. of Am., 252 F.3d 738, 740 (5th Cir. 2001) (citing Goose
Creek Consol. I.S.D. v. Cont=l Cas. Co., 658 S.W.2d 338, 339 (Tex. App.CHouston [1st Dist.] 1983, no
writ)).  Under the Acause@ analysis, the proper focus in
interpreting Aoccurrence@ under a liability policy is on the
number of events that cause the injuries and give rise to the insured=s liability, rather than the number
of injurious effects.  See id.
(citing H.E. Butt Grocery Co. v. Nat=l Union Fire Ins. Co., 150 F.3d 526, 530 (5th Cir. 1998));
Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co., 447 F.2d
204, 206 (5th Cir. 1971).

For example, in Maurice Pincoffs, the insured imported
and then sold contaminated bird seed to eight different dealers.  447 F.2d at 205.  The eight dealers resold the seed to various
bird owners, whose birds died as a result of the contamination.  Id. 
Although the district court held that there was one Aoccurrence@Cthe contamination, the Fifth Circuit
held that each of the eight sales was a separate Aoccurrence.@ 
Id. at 205B06.  The court reasoned
that it was not the act of contamination that subjected the insured to
liability.  Id. at 206.  The insured received the seed in a
contaminated state and did not itself contaminate the seed.  Id. 
If the insured had destroyed the seed before sale, there would have been
no Aoccurrence@ and no resulting liability.  Id.  
However, once the sale was made, the insured was liable for any
resulting damage.  Id.  Therefore, each of the eight sales resulted
in a new liability.  Id.;[38]
see also H.E. Butt Grocery, 150 F.3d at 533, 535 (finding store employee=s molestation of two children at
different times constituted two Aoccurrences@ because the store was exposed to new
liability for each independent act of molestation, despite insured=s argument that store=s negligent supervision of employee
was one Aoccurrence@); State Farm Lloyds, Inc. v.
Williams, 960 S.W.2d 781, 785 (Tex. App.CDallas 1997, pet. dism=d by agr.) (holding that homeowner=s shooting two people in same room
constituted separate Aoccurrences@ because the injuries resulted from two separate acts, each
independently giving rise to liability).








Here, Lennar contends there was only one Aoccurrence@ because there was only one cause of
damage to the EIFS homesCEIFS=s repeated and continuous entrapment of water.  We disagree. 
Examining the number of events resulting in Lennar=s liability, we conclude the EIFS
claim for each home constitutes a separate Aoccurrence.@ 
The fact that EIFS is generally a defective product that traps water
would not have resulted in Lennar=s liability to each homeowner absent
application of EIFS to each home.  Lennar
was not the designer or the manufacturer of EIFS.  Rather, Lennar=s liability stemmed from the fact
that it built and sold homes with EIFS. 
Thus, Lennar=s liability to a particular homeowner stemmed from the
application of EIFS, and the resulting damage, if any, to his or her particular
home. Further, there was not one entrapment of water that caused damage to all
the homes.  Instead, the EIFS=s entrapment of water on a particular
home caused the damage to that home only. 
Therefore, Lennar was exposed to a new and separate liability for each
home on which EIFS was applied.  See
Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1212B14 (2nd Cir. 1995) (stating Texas law
would apparently support finding that application of asbestos to numerous
buildings constituted separate Aoccurrences@ despite insured=s argument that its course of
manufacturing and selling asbestos products constituted one Aoccurrence@); Fina, Inc. v. The Travelers
Indem. Co., 184 F. Supp. 2d 547, 549B52 (N.D. Tex. 2002) (finding claims
of numerous workers exposed to asbestos at three Fina facilities constituted at
least three Aoccurrences@ because it was exposure to asbestos
which resulted in injuries and suit against Fina).








Lennar cites several cases from other jurisdictions
purporting to show that courts have found only one Aoccurrence@ in similar situations; however, none
of these cases applied Texas law.[39]  The cases cited by Lennar that have applied
Texas law would support an argument that multiple EIFS-related damages to one
home arose from one Aoccurrence@; however, they do not support Lennar=s argument that the EIFS-related
damages to all homes arose from one Aoccurrence.@  See Foust v. Ranger Ins. Co., 975 S.W.2d
329, 335 (Tex. App.CSan Antonio 1998, pet. denied) (holding crop-duster=s application of herbicide that
damaged claimants= adjacent cotton crop constituted one Aoccurrence@ because application was one
procedure despite multiple passes and refueling stops in a span of a few hours);
Carpenter Plastering Co. v. Puritan Ins. Co., CIV A. No. 3-87-2435-R,
1988 WL 156829, at *1, 4 (N.D. Tex. Aug. 23, 1988) (not designated for
publication) (holding multiple damages to one building caused by
defective wall panels constituted one Aoccurrence@). 
Consequently, the EIFS claim for each home constitutes a separate Aoccurrence.@

B.        No
Damages Exceeding The SIR For Any Home








Because the EIFS claim for each home constitutes a separate Aoccurrence,@ Lennar must satisfy a $250,000 SIR
for each home before coverage is triggered under the Gerling policy.  However, the summary judgment evidence
demonstrates Lennar has not paid damages exceeding $250,000 for any one
home.  Gerling attached to its motion for
summary judgment a chart prepared by Lennar reflecting the costs it has
incurred for each home.  Lennar included
a similar chart in its summary judgment evidence.[40]  Both charts show only one home with costs
exceeding $250,000.  Gerling assumes this
amount is a typographical error.  While
not specifically conceding this amount is an error, Lennar has not disputed
Gerling=s assumption.  In fact, Lennar acknowledges in its brief
that if Lennar must pay a $250,000 SIR per home due to multiple Aoccurrences,@ any coverage would be Acompletely eliminated@ under the Gerling policy.  Thus, Lennar effectively concedes it has not
incurred costs exceeding $250,000 for any one home.  Therefore, Lennar cannot satisfy the $250,000
SIR applicable to each Aoccurrence,@ and Gerling has no duty to indemnify Lennar for the EIFS
claims.  Accordingly, the trial court
properly granted Gerling=s motion for summary judgment.

VII. 
RLI, ICSOP, and Westchester

RLI, ICSOP, and Westchester each issued an umbrella liability
policy.[41]  As it did with all of the carriers, Lennar
moved for summary judgment asserting that the EIFS claims are covered under the
RLI, ICSOP and Westchester policies because the claims constitute Aproperty damage@ caused by an Aoccurrence.@ 
We have already concluded that there is no coverage for Lennar=s costs to replace EIFS as a
preventative measure.  Therefore, because
there is no coverage for a portion of Lennar=s costs, the trial court properly
denied Lennar=s motion for summary judgment as to
RLI, ICSOP and Westchester.  However, we
have determined that Lennar=s costs to repair water damage constitute Aproperty damage@ caused by an Aoccurrence.@ 
Accordingly, we have considered these carriers= other grounds for defeating
coverage.  We find one similar ground
dispositive as to all these carriers, so we will discuss them together.








Specifically, these excess carriers assert that they have no
duty to indemnify Lennar because Lennar has not exhausted the underlying policy
limits.  Each excess carrier asserts that
the underlying carrier must pay its policy limits before the excess carrier has
a duty to indemnify Lennar.   According
to Lennar, the policies do not require the underlying carrier to pay its policy
limits before the excess carrier has a duty to indemnify Lennar; instead, the
excess carrier has a duty to indemnify Lennar whether the underlying carrier or
Lennar has paid the primary policy limits.

We need not decide whether RLI, ICSOP, or Westchester have a
duty to indemnify Lennar as long as either the underlying carrier or Lennar has
paid the primary policy limits because we have concluded that the primary
policy limits will not be paid by either the underlying carrier or Lennar.  Lennar must satisfy a $250,000 SIR per Aoccurrence@ before the amounts of the underlying
policy limits are triggered.  As we have
already determined, the EIFS claim for each home is a separate Aoccurrence,@ and Lennar has not paid damages in
excess of $250,000 for any home. 
Therefore, Lennar=s payments will not even trigger, much less, exhaust the
underlying policy limits.








In fact, Lennar acknowledges in its brief that if each EIFS
claim constitutes a separate Aoccurrence,@ Lennar would Abe without any insurance except as to
[American Dynasty] and Markel.@[42] 
More specifically, Lennar acknowledges that if each home constitutes a
separate Aoccurrence,@Aany coverage owed to Lennar would be
completely eliminated under the Westchester, . . . RLI and ICSOP policies.@ 
Therefore, because Lennar effectively concedes that the underlying
policy limits cannot be exhausted by either an underlying carrier or Lennar,
RLI, ICSOP, and Westchester have no duty to indemnify Lennar for the EIFS
claims.[43]  Accordingly, the trial court properly granted
RLI, ICSOP, and Westchester=s motions for summary judgment.

VIII.  American Dynasty

American Dynasty is Lennar=s other primary carrier.  American Dynasty issued a CGL policy,
effective June 1, 1999 to June 1, 2001, with a policy limit of $1 million per Aoccurrence.@ 
As it did with all carriers, Lennar moved for summary judgment asserting
that it established coverage under the American Dynasty  policy because the EIFS claims constitute Aproperty damage@ caused by an Aoccurrence.@ 
American Dynasty moved for summary judgment on the following
grounds:  (A) there is no Aoccurrence@ and no Aproperty damage@; (B) Lennar failed to exhaust the $1
million annual aggregate SIR; (C) certain exclusions preclude coverage; (D) the
Aknown loss@ and Aloss in progress@ doctrines preclude coverage; and (E)
Lennar failed to comply with a  policy
condition.

A.        AOccurrence@ and
AProperty Damage@ 

We have already concluded that there is no coverage for
Lennar=s costs to replace EIFS as a
preventative measure.  Therefore, because
there is no coverage for a portion of Lennar=s costs, the trial court properly
denied Lennar=s motion for summary judgment as to
American Dynasty.  However, we have
determined that Lennar=s costs to repair water damage constitute Aproperty damage@ caused by an Aoccurrence.@ 
Therefore, the trial court erred if it granted American Dynasty=s motion for summary judgment on the
ground that there was no Aoccurrence@ and no Aproperty damage.@ 
Accordingly, we will consider American Dynasty=s other summary judgment grounds.








B.        Satisfaction of SIR

American Dynasty contends it has no duty to indemnify Lennar
because Lennar has not satisfied the SIR contained in the policy.  The policy includes an SIR of $250,000 per Aoccurrence@ with a $1 million annual aggregate
for the SIR.  Therefore, to the extent
coverage otherwise exists, there is an annual $1 million limit on the amount
that Lennar must satisfy before American Dynasty has a duty to indemnify
Lennar.  American Dynasty contends that
Lennar has failed to exhaust the $1 million aggregate SIR.  American Dynasty=s summary judgment ground with
respect to exhaustion of the SIR was a no-evidence ground.  In response, Lennar cites evidence
demonstrating it has incurred more than $5 million in repair and replacement
costs.  However, the portion of these
costs attributable to repair of water damage, as opposed to replacement of EIFS
as a preventative measure, remains to be determined.  Therefore, it is premature to decide whether
Lennar has exhausted the $1 million aggregate SIR.  Accordingly, the trial court erred if it
granted American Dynasty=s motion for summary judgment on the ground that Lennar has
failed to exhaust the $1 million aggregate SIR.[44]

C.        Exclusions

American Dynasty contends that its exclusions J(5), M, and N
preclude coverage for the EIFS claims.

1.         Exclusion
J(5) 

Exclusion J(5) excludes coverage for Aproperty damage@ to:








that particular part of real property
on which you or any contractors or subcontractors working directly or
indirectly on your behalf are performing operations, if the Aproperty damage@ arises out of those operations;

(emphasis added).  American Dynasty
contends that this exclusion precludes coverage because the Aproperty damage,@ if any, arose out of Lennar=s operations.  We disagree. 


Giving the exclusion its plain meaning, the use of the
present tense indicates the exclusion applies only to Aproperty damage@ arising while Lennar is currently
working on a project.  See Main
Street Homes, 79 S.W.3d at 696 (holding exclusion J(5) did not preclude
coverage for foundation defects because petition indicated insured had
completed construction and sold the homes before the damage resulted); cf.
Houston Bldg. Serv., Inc. v. Am. Gen. Fire & Cas. Co., 799 S.W.2d
308, 311 (Tex. App.CHouston [1st Dist.] 1990, writ denied) (finding exclusion
J(5) precluded coverage for damage occurring while insured janitorial
company was cleaning building because operations had not been completed); Malone,
147 F. Supp. 2d 628B29 (holding exclusion J(5) barred coverage for construction
defects and noting, when discussing another exclusion, that insured=s work could not be deemed
completed).

American Dynasty cites no evidence that the water damage to
the homes occurred while Lennar was building the homes.  To the contrary, the evidence reflects that
the damage began shortly after the homes were completed.[45]  Therefore, exclusion J(5) does not preclude
coverage for the costs to repair the water damage.  Accordingly, the trial court erred if it
granted summary judgment for American Dynasty based on exclusion J(5).

2.         Exclusion M

Exclusion M excludes coverage for: 








AProperty damage@ to Aimpaired property@ or property
that has not been physically injured, arising out of:

(1)       A defect, deficiency, inadequacy or dangerous condition in Ayour product@ or Ayour work@; or

(2)       A delay or
failure by you or anyone acting on your behalf to perform a contract or
agreement in accordance with its terms.

American Dynasty contends exclusion M precludes coverage for
the replacement of EIFS because the EIFS was not physically injured but was,
instead, replaced because it was defective. 
While exclusion M might arguably apply to the replacement of EIFS, it
does not apply to the costs incurred by Lennar to repair physical injuryCwater damageCto the homes.[46]  Accordingly, 
the trial court erred if it granted summary judgment for American
Dynasty based on exclusion M.

3.         Exclusion N

Exclusion N, commonly known as the Asistership@ exclusion, precludes coverage for:

Damages claimed for any loss, cost or expense incurred
by you or others for the loss of use, withdrawal, recall, inspection, repair,
replacement, adjustment, removal or disposal of:

(1) Ayour product@;

(2) Ayour work@; or

(3) Aimpaired property@;

if such product, work, or property is
withdrawn or recalled from the market or from use by any person or organization
because of a known or suspected defect, deficiency, inadequacy or dangerous
condition in it.








American Dynasty contends exclusion N precludes coverage for
replacement of EIFS because it is inherently defective.  While this exclusion might also arguably
apply to replacement of EIFS as a preventative measure, it clearly does not
apply to Lennar=s costs to repair water damage to the homes.  Accordingly, the trial court erred if it
granted summary judgment for American Dynasty based on exclusion N.

D.        AKnown Loss@ and ALoss in
Progress@ Doctrines

American Dynasty also moved for summary judgment on the
ground that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
EIFS claims.[47]  Generally, fortuity is an inherent requirement
of all risk insurance policies.  Scottsdale Ins. Co. v. Travis, 68 S.W.3d
72, 75 (Tex. App.CDallas 2001, pet. denied); see Two Pesos, Inc. v. Gulf
Ins. Co., 901 S.W.2d 495, 501 (Tex. App.CHouston [14th Dist.] 1995, no
writ).  The Aknown loss@ and Aloss in progress@ doctrines are components of the
fortuity doctrine.  See Travis, 68
S.W.3d at 75; Two Pesos, 901 S.W.2d at 501.  A Aknown loss@ is a loss the insured knew had
occurred at the time it purchased the policy.  See Travis, 68 S.W.3d at 75 (citing Burch
v. Commonwealth Mut. Ins. Co., 450 S.W.2d 838, 840B41 (Tex. 1970)).  A Aloss in progress@ occurs when the insured is, or
should be, aware of an ongoing progressive loss at the time it purchased the
policy.  Id.; Two Pesos,
901 S.W.2d at 501.  Insurance coverage is
precluded for a Aknown loss@ or Aloss in progress.@ 
See Travis, 68 S.W.3d at 75; Two Pesos, 901 S.W.2d at 501.








American Dynasty argues that when Lennar purchased the
American Dynasty policy on June 1, 1999,[48]
Lennar knew the extent of the EIFS-related problems; thus, the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for all
the EIFS claims.  We conclude that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for some
of the EIFS claims as a matter of law.  However,
a genuine issue of material fact exists regarding whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
remainder of the EIFS claims.

1.         Claims For Which Coverage Precluded

American Dynasty has proved that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for some
of the EIFS claims as a matter of law. 
In particular, Lennar knew of the EIFS-related damage to a few homes as
of June 1, 1999.  Daris Horn testified
that beginning in 1995, Lennar had repaired EIFS-related problems on several
homes.  Further, Lennar was still working
on some of these homes in June 1999. 
Therefore, Lennar clearly knew of these Alosses@ when it purchased the American
Dynasty policy.  See Travis, 68
S.W.3d at 75; Two Pesos, 901 S.W.2d at 501.

Horn also testified that Lennar received additional homeowner
Ainquiries@ in the spring of 1999.  The record is not clear on whether Lennar
discovered and/or repaired EIFS-related Aproperty damage@ to these homes in the spring of 1999
or merely fielded inquiries from these homeowners.  To the extent that Lennar had discovered
and/or repaired EIFS-related Aproperty damage@ to a home, then Lennar clearly knew
of the Aloss@ when it purchased the American
Dynasty policy.

Nonetheless, Lennar asserts that it did not know EIFS was a
defective product until September 1999. 
Regardless, Lennar knew of some EIFS-related Alosses@ by June 1, 1999 although it may not
have known the underlying cause of the problems or the extent of the
problems.  Therefore, the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for
homes on which Lennar was aware of damage and/or had made repairs when it
purchased the American Dynasty policy.[49]

 








2.         Fact Issue On
Remaining Claims

There is a genuine issue of material fact on whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
remaining EIFS claims.  The evidence is
conflicting on whether Lennar should have known about the ongoing Aproperty damage,@ if any, to these homes as of June 1,
1999.

American Dynasty cites evidence to establish that Lennar
knew, or should have known, of the magnitude of the EIFS-related problems as of
June 1, 1999.  As far back as 1995,
Lennar had begun repairing EIFS-related damage to a few homes.  In 1997, Lennar was named as a defendant in a
lawsuit alleging EIFS is a defective product. 
During the spring of 1999, Lennar experienced an increase in homeowner Ainquiries@ following the television programs
regarding EIFS.[50]  Further, during the spring of 1999, several
Lennar employees, including Horn and the Village Builders= president, were Adiscussing@ EIFS issues, and several employees
spent a total of 266 hours on EIFS issues. 
In May 1999, several employees, including Horn, were approved to attend
an EIFS remediation seminar to take place in June 1999.  This evidence strongly suggests that Lennar
should have realized the magnitude of the EIFS-related problems by June 1,
1999.








On the other hand, Lennar presented evidence negating that it
should have realized the magnitude of the EIFS-related problems as of June 1,
1999.  According to Horn, through the
spring of 1999, Lennar had received only a few EIFS complaints.  However, Lennar did not suspect an inherent
defect in EIFS.  Instead, the EIFS
manufacturers assured Lennar that any problems were due to installation error.[51]  Despite the increase in homeowner inquiries
in spring 1999, Lennar still thought the problems were caused by installation
error.  It was not until September 1999,
after Lennar spent the summer responding to more complaints, that it recognized
a systematic product defect that would likely involve hundreds of homes.  At that time, Lennar modified its plan to
address EIFS problems.  Lennar decided to
identify all EIFS homes and determine the number of staff members necessary to
address the claims.  Lennar employees
also discussed whether to notify Lennar=s CGL insurers of the claims.[52]








Taking Lennar=s evidence as true and resolving all doubts in its favor, see
Reese, 148 S.W.3d at 99, there is a genuine issue of material fact on
whether Lennar should have known when it purchased the American Dynasty policy
that EIFS had damaged, or was in the process of damaging, all the homes on
which it was installed.  See Asbestos
Claims Mgmt. Corp., 73 F.3d at 1214B15 (holding Aknown loss@ doctrine did not bar coverage for
asbestos claims, except claims for which insured had been sued, or received
pre-suit demand, before policy incepted; although insured knew before policy
incepted that its product risked causing diseases and had received large number
of claims, it was uncertain as to prospective number of injuries and claims,
likelihood of successful claims, and amount of ultimate net losses); Ins.
Co. of N. Am. v. U.S. Gypsum Co., 870 F.2d 148, 151B53 (4th Cir. 1989) (holding Aloss in progress@ doctrine did not bar coverage for
damage caused by massive subsidence beneath gypsum plant after policy incepted;
although other subsidence had occurred before policy incepted, it had not
damaged facilities, insured= witnesses did not expect the massive subsidence, insured
invested millions in plant indicating it did not expect massive subsidence, and
there was no certainty subsidence was destined to occur).[53]  Therefore, there is a genuine issue of
material fact on whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for all
the EIFS claims.  Accordingly, the trial
court erred if it granted American Dynasty=s motion for summary judgment based
on the Aknown loss@ and Aloss in progress@ doctrines.

E.        Policy
Condition

American Dynasty also moved for summary judgment on the
ground that there is no coverage for certain EIFS claims because Lennar
violated a policy condition. 
Specifically, the policy requires Lennar to promptly notify American
Dynasty of any claim, suit, or Aoccurrence@ that may result in a claim. 
Lennar did not notify American Dynasty of any EIFS claims until January
28, 2000.  However, by that time, Lennar
had already settled some of the claims. 
Therefore, American Dynasty contends there is no coverage for the claims
Lennar settled before notifying American Dynasty.








In response, Lennar contends that American Dynasty failed to
prove that it was prejudiced by the lack of notice.  Compliance with a notice provision is a
condition precedent to coverage under a policy. 
Struna v. Concord Ins. Servs., Inc., 11 S.W.3d 355, 359 (Tex.
App.CHouston [1st Dist.] 2000, no
pet.).  However, to enforce a condition
precedent to coverage, the insurer must prove that it was prejudiced by the
insured=s failure to comply with the
condition.  Comsys, 130 S.W.3d at
191B92 (citing Ins. Co. of N. Am. v.
McCarthy Bros. Co., 123 F. Supp. 2d 373, 379 (S.D. Tex. 2000); Hernandez
v. Gulf Group Lloyds, 875 S.W.2d 691, 692B94 (Tex. 1994));[54]
Struna, 11 S.W.3d at 359. 
Specifically, an insurer must show it was prejudiced by the insured=s failure to give the insurer notice
of a claim.  See Harwell v. State Farm
Mut. Auto. Ins. Co., 896 S.W.2d 170, 174 (Tex. 1995); Liberty Mut. Ins.
Co. v. Cruz, 883 S.W.2d 164, 165 (Tex. 1993); Struna, 11 S.W.3d at
359B60. 
Whether an insurer is prejudiced by lack of notice is generally a question
of fact.  Struna, 11 S.W.3d at 359B60. 
In requiring the insurer to show prejudice, Texas law recognizes that
only a material breach excuses performance. 
Comsys, 130 S.W.3d at 192 (citing McCarthy Bros., 123 F.
Supp. 2d at 379; Hernandez, 875 S.W.2d at 693)).  If the insurer is not prejudiced, the insured=s breach is not material.  See id. (citing Hernandez, 875
S.W.2d at 693).

American Dynasty asserts that it was prejudiced as a matter
of law by Lennar=s settling certain EIFS claims before notifying American
Dynasty of the claims.  American Dynasty
cites C.M.S. v. State Farm Lloyds, in which the court seemed to find
prejudice as a matter of law based solely on the fact that the insured settled
the suit before notifying the insurer. 
No. Civ. A. 3:97CV3202H, 1998 WL 386160, at * 4B5 (N.D. Tex. July 7, 1998) (not
designated for publication).  However,
that holding is contrary to Texas law.

Texas law does not presume prejudice from Asettlement without consent@ or lack of notice.  Hanson Prod. Co. v. Americas Ins. Co.,
108 F.3d 627, 631 (5th Cir. 1997); Comsys, 130 S.W.3d at 192.  Therefore, we reject American Dynasty=s argument that it was prejudiced as
a matter of law by Lennar=s settling certain EIFS claims before notifying American
Dynasty.  See McCarthy Bros., 123
F. Supp. 2d at 379B80 (rejecting insurer=s suggestion it was prejudiced per
se by insured contractor=s settling owner=s negligent construction suit by
agreeing to make repairs before notifying insurer of the suit because insured
was a sophisticated commercial entity actively attempting to limit its
liability); Comsys, 130 S.W.3d at 192 (recognizing mere fact that the
insurer owes money it does not wish to pay does not constitute prejudice as a
matter of law).








Instead, American Dynasty has presented no evidence it was
prejudiced by the lack of notice.  See
Comsys, 130 S.W.3d at 192 (stating insurer who failed to raise even an
inference of collusion, fraud, or other connivance in the settlement agreement
failed to prove prejudice from settlement without consent); cf. Harwell,
896 S.W.2d at 172B74 (finding insurer of deceased motorist was prejudiced by
estate administrator=s failure to give insurer notice of plaintiff=s suit arising from auto accident;
administrator, who was a secretary in plaintiff=s attorney=s office, appeared pro se at trial
and offered no defense of  deceased
motorist, then notified insurer of adverse judgment one day after time to file
motion for new trial or appeal had expired). 
Therefore, the trial court erred if it granted summary judgment on the
EIFS claims Lennar settled before notifying American Dynasty.

In sum, because American Dynasty was not entitled to summary
judgment on any of the grounds raised in its motion, the trial court erred in
granting summary judgment in favor of American Dynasty.

IX. 
Markel 

Markel issued a commercial umbrella liability policy,
effective June 1, 1999 to June 1, 2001 with a policy limit of $25,000,000 per Aoccurrence.@ 
The Markel policy is excess to the American Dynasty policy.

As it did with all the carriers, Lennar moved for summary
judgment asserting there is coverage under the Markel policy because the EIFS
claims constitute Aproperty damage@ caused by an Aoccurrence.@ 
Markel asserted several summary judgment grounds: (A) there is no Aoccurrence@ and no Aproperty damage@; (B) several exclusions preclude
coverage; (C) the Aknown loss@ and Aloss in progress@ doctrines preclude coverage; (D)
Lennar failed to comply with certain policy conditions; and (E) the EIFS claim
for each home constitutes a separate Aoccurrence,@ the underlying SIR has not been
exhausted, and/or the underlying policy limits have not been exhausted.

A.        AOccurrence@ and AProperty
Damage@








We have already concluded that there is no coverage for
Lennar=s costs to replace EIFS as a
preventative measure.  Therefore, because
there is no coverage for a portion of Lennar=s costs, the trial court properly
denied Lennar=s motion for summary judgment as to
Markel.  However, we have determined that
Lennar=s costs to repair water damage
constitute Aproperty damage@ caused by an Aoccurrence.@ 
Therefore, the trial court erred if it granted Markel=s motion for summary judgment on the
ground that there was no Aoccurrence@ and no Aproperty damage.@ 
Accordingly, we will consider Markel=s other grounds for defeating
coverage.

B.        Exclusions

Markel contends that its Endorsement 2, Exclusion B(2),
Exclusion B(10), and Exclusion B(6)(e) preclude coverage for the EIFS claims.

1.         Endorsement 2

Endorsement 2 precludes coverage for Aproperty damage@ to A[p]roperty . . . occupied by, used
by, or owned by any Insured.@  According to Markel,
this endorsement precludes coverage for the EIFS claims because at one time,
Lennar occupied, used, and owned the property upon which the EIFS homes were
built.  We disagree.

Considering the plain meaning of Endorsement 2, it applies
only to damage arising while the property is occupied, used, or owned by
Lennar.  This exclusion has been
interpreted to preclude coverage for damage limited exclusively to the insured=s property.  See Am. States Ins. Co. v. Hanson Indus.,
873 F. Supp. 17, 24 (S.D. Tex. 1995). 
The  exclusion ensures that
liability insurance provides compensation for damages to property not owned or
controlled by the insured.  See id.;
see also State Farm Fire & Cas. Co. v. English Cove Ass=n, Inc., 88 P.3d 986, 992 (Wash. App. 2004)
(stating Aowned property@ exclusion prevents a liability
policy from providing first‑party benefits to the insured).             








Nonetheless, Markel refers us to another exclusion, B(6)(a),
in its policy.  Although Markel does not
rely on Exclusion B(6)(a) to defeat coverage, Markel urges that exclusion
B(6)(a) supports its interpretation of Endorsement 2.  Exclusion B(6)(a) excludes coverage for
damage to Aproperty you own, rent, or occupy.@ 
According to Markel, because Exclusion B(6)(a) is in the present tense,
then Endorsement 2 must refer to the past tense.  Specifically, Markel stresses that the words Aleased, occupied, or
owned@ in Endorsement 2 refer to the past
tense; thus, Endorsement 2 applies to damage to property that was ever occupied,
used, or owned by Lennar.

Despite Exclusion B(6)(a), we read Endorsement 2 in the
present tense.  Clearly, the words Aoccupied by, used by, or owned by,@ instead of Aoccupy, use, or own,@ are included because Endorsement 2
is in the passive voiceCnot because Endorsement 2 refers to the past tense.  Further, Endorsement 2 is entitled ACare, Custody, and Control Exclusion.@ 
This title indicates Endorsement 2 excludes coverage for damage arising
while the property is in Lennar=s Acare, custody, and control@Cnot damage to property that was ever
in Lennar=s Acare, custody, and control.@ 

Finally, Markel cites two cases in which courts held that
coverage was precluded by the Aowned or leased property@ exclusions although the insureds no
longer owned or leased the property.  See
Dryden Oil Co. of New England, Inc. v. Travelers Indem. Co., 91 F.3d
278, 284 (1st Cir. 1996); Morrone v. Harleysville Mut. Ins. Co., 662
A.2d 562, 565 (N.J. Super. Ct. App. Div. 1995). 
However, these cases are inapplicable because the damage occurred while
the insureds owned or leased the property although the insureds no longer owned
or leased the property when the claims were made.  See Dryden Oil, 91 F.3d at 280B81, 284; Morrone, 662 A.2d at
565.  In contrast, here, Markel cites no
evidence that Aproperty damage@ to the EIFS homes arose while they
were still occupied, used, or owned by Lennar. 
Accordingly, the trial court erred if it granted summary judgment for
Markel based on Endorsement 2.

2.         Exclusion
B(2)








With certain exceptions, Exclusion B(2) excludes coverage
for  A>property damage= for which the insured is obligated
to pay damages by reason of the assumption of liability in a contract or
agreement.@ 
Markel contends Lennar=s voluntary agreements to repair the EIFS homes constitute
contracts under which Lennar assumed liability. 
However, this exclusion is inapplicable here.

Exclusion B(2) precludes coverage when the insured
contractually assumes liability for the conduct of a third party such as
through an indemnity or hold harmless agreement.  See Federated Mut. Ins. Co. v. Grapevine
Excavation, Inc., 197 F.3d 720, 726 (5th Cir. 1999); McCarthy Bros.,
123 F. Supp. 2d at 377B78; see also Am. Girl, 673 N.W.2d at 80B81; Olympic, Inc. v. Providence
Wash. Ins. Co., 648 P.2d 1008, 1010B11 (Ak. 1982).  Lennar=s settlement of the EIFS claims was
not contractual assumption of a third party=s liability, but rather resulted from
Lennar=s own conduct.  See McCarthy Bros., 123 F. Supp. 2d at
377B78 (holding that Aassumption of liability@ exclusion did not preclude coverage
for insured builder=s agreement through settlement to repair damage caused by its
faulty construction because insured accepted liability for its own conductCnot liability of a third party).  Accordingly, the trial court erred if it
granted summary judgment for Markel based on Exclusion B(2).

3.         Exclusion
B(10)

Exclusion B(10) is Markel=s Asistership@ exclusion.  It is virtually identical to American Dynasty=s sistership exclusion.  We have already concluded that the sistership
exclusion does not apply to Lennar=s costs to repair water damage.  Accordingly, the trial court erred if it
granted summary judgment for Markel based on Exclusion B(10).

4.         Exclusion
B(6)(e)








Markel=s Exclusion B(6) (e) is virtually identical to American
Dynasty=s exclusion J(5).  Exclusion B(6)(e) precludes coverage for Aproperty damage@ to A[t]hat particular part of real
property on which you or a contractor or subcontractor working directly or
indirectly for you  are performing
operations, if the >property damage= is due to those operations.@ 
We have already rejected application of this exclusion.  Accordingly, the trial court erred if it
granted summary judgment for Markel based on Exclusion B(6)(e).

C.        AKnown Loss@ and ALoss in
Progress@ Doctrines

Markel also contends that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
EIFS claims.  Our analysis is similar to
the Aknown loss@ and Aloss in progress@ analysis under the American Dynasty
policy.  However, we evaluate Markel=s Aknown loss@ and Aloss in progress@ defenses using a different date
because Markel=s policy was purchased on July 21,
1999Calmost two months after the American
Dynasty policy.[55]  Again, we conclude that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for some
of the EIFS claims as a matter of law. 
However, a genuine issue of material fact exists on whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
remainder of the EIFS claims.

1.         Claims For
Which Coverage Precluded

Markel has proved that the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for some
of the EIFS claims.  Markel also relied
on Daris Horn=s deposition in support of its motion
for summary judgment.  Her testimony
established that Lennar knew of the EIFS-related damage to a few of the homes
as of July 21, 1999 because it had repaired, or was in the process of
repairing, these homes.  Thus, Lennar
clearly knew of these Alosses@ when it purchased the Markel policy.








Further, Horn=s testimony established that Lennar had received further Ainquiries@ by July 21, 1999.  Again, it is not clear whether Lennar had
discovered and/or repaired EIFS-related Aproperty damage@ to some or all of these homes by
July 21, 1999 or merely fielded inquiries from these homeowners.  To the extent that Lennar had discovered
and/or repaired EIFS-related Aproperty damage@ to a home by July 21, 1999, then
Lennar clearly knew of the Aloss@ when it purchased the Markel policy.  Therefore, the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for
homes on which Lennar was aware of and/or had repaired EIFS-related Aproperty damage@ when it purchased the Markel policy.[56]

2.         Fact Issue On
The Remaining Claims

There is a genuine issue of material fact on whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for the
remainder of the EIFS claims.  The
evidence is conflicting on whether Lennar should have known of the ongoing Aproperty damage,@ if any, to these homes as of July
21, 1999.  Markel cites the same evidence
cited by American Dynasty to argue that Lennar should have known of the
magnitude of the EIFS-related problems by July 21, 1999.  However, Markel cites some additional
evidence because its policy was purchased later.

In particular, by July 21, 1999, Horn and other Lennar
employees had actually attended the EIFS remediation seminar for which they
were previously approved.  Further, by
July 21, 1999, Lennar had formulated a plan to address EIFS complaints.  In addition, Lennar spent the summer of 1999
responding to EIFS claims, so presumably Lennar was becoming increasingly aware
of EIFS=s potential to cause damage by July
21, 1999.  This evidence strongly
suggests Lennar should have realized the magnitude of the EIFS problems by that
date.[57]








On the other hand, Lennar presented evidence negating that it
should have realized the magnitude of the EIFS problems by July 12, 1999.  Although Lennar had formulated a plan to
address EIFS complaints by that date, the plan was to address the complaints on
an individual basis as they were received. 
Thus, this plan raises the inference that Lennar had not yet decided
that all EIFS homes had experienced damage and must be addressed regardless of
whether the homeowner made a complaint. 
Again, Lennar averred that it did not know until September 1999 that
EIFS was defective and would likely damage hundreds of homes.  

Taking Lennar=s evidence as true and resolving all doubts in its favor,
there is a genuine issue of material fact on whether Lennar should have known
when it purchased the Markel policy that EIFS had damaged, or was in the
process of damaging, all homes on which it was installed.  See Asbestos Claims Mgmt., 73 F.3d at
1214B15; U.S. Gypsum, 870 F.2d at
151B53. 
Consequently, there is a genuine issue of material fact on whether the Aknown loss@ and Aloss in progress@ doctrines preclude coverage for all
the EIFS claims.  Accordingly, the trial
court erred if it granted Markel=s motion for summary judgment based
on the Aknown loss@ and Aloss in progress@ doctrines.

D.        Policy Conditions








Markel further contends that coverage for the EIFS claims is
precluded because Lennar violated condition E of the policy.  Condition E provides that Lennar must notify
Markel of any claim, suit, or occurrence that may result in a claim or
suit.  Condition E also provides that
Lennar shall not, except at its own cost, voluntarily make any payment, assume
any obligation, or incur any expense without Markel=s consent.  Markel contends that Lennar violated these
conditions by failing to timely give Markel notice of the EIFS claims and by
voluntarily settling the claims without Markel=s consent.[58]  However, Markel has not established that it
was prejudiced by Lennar=s violating these conditions. 
See Hanson Prod., 108 F.3d at 631; McCarthy Bros., 123 F.
Supp. 2d at 379; Hernandez, 875 S.W.2d at 692B94; Comsys, 130 S.W.3d at 191B92.

With respect to Lennar=s late notice, Markel offered only
one reason that it was prejudiced in its motion for summary judgment: ALennar=s inability to parse its damages any
finer than rough allocations for inspection and repair, and accompanying
administrative and legal costs.@  Markel does not
elaborate on how this difficulty constitutes prejudice.  Nonetheless, we cannot conclude that any
difficulty Lennar may have in proving the exact amount of various components of
its costs has prejudiced Markel as a matter of law.  At the least, whether any such difficulty has
prejudiced Markel is a question of fact. 
With respect to Lennar=s settlement without consent, Markel presented no evidence
that it was prejudiced in its motion for summary judgment.  Accordingly, the trial court erred if it
granted summary judgment for Markel based on Lennar=s violation of policy conditions.

E.        Separate Occurrences/Exhaustion of Underlying SIR or Policy Limits

Finally, Markel asserts it was entitled to summary judgment
because each home constitutes a separate Aoccurrence,@ Lennar has not exhausted the
underlying SIR, and/or Lennar has not exhausted the underlying policy
limits.  Markel=s argument is unclear because it
makes several different arguments in its brief and motion for summary judgment.

In its brief, Markel adopts Gerling=s argument that each home is a
separate Aoccurrence,@ and AThere Is No Coverage Because All Of
The Settlements Are Within The Policy=s [SIR] Of $250,000 Per Occurrence.@ 
However, Markel=s policy is excess to the American Dynasty policyCnot the Gerling policy.  Therefore, Markel=s argument that none of the
settlements exceeds the Gerling $250,000 SIR is inapplicable.








Further, Markel=s argument in its brief is different
than the grounds raised in its motion for summary judgment.  When outlining its summary judgment grounds
at the beginning of its motion, Markel acknowledges that the underlying policy
is the American Dynasty policy.  Markel
states that coverage under the Markel policy has not been triggered because the
American Dynasty $250,000 SIR has not been properly exhausted.  However, as we have explained, there is an
annual $1 million aggregate SIR under the American Dynasty policy.  Therefore, Markel=s argument that the American Dynasty
$250,000 SIR has not been exhausted does not necessarily preclude coverage
under the Markel policy.  Instead, as we
have explained, it is premature to determine whether Lennar has exhausted the
$1 million aggregate SIR, and thus, whether Lennar will trigger the American
Dynasty policy, or ultimately, the Markel policy.

Finally, in the body of its summary judgment motion, Markel
seems to make a different argument. 
Instead of referring to the American Dynasty SIR, Markel asserts that
the underlying American Dynasty policy limits have not been exhausted, and,
thus, the Markel policy has not been triggered. 
Again, it is premature to determine whether Lennar has exhausted the
American Dynasty policy limits, and thus, whether Lennar will trigger the
Markel policy.

In sum, because Markel was not entitled to summary judgment
on any of the grounds raised in its motion, the trial court erred by granting
summary judgment in favor of Markel.

X.  American Dynasty=s Motion for Summary Judgment


On Lennar=s
Extra-Contractual Claims








In a separate motion, American Dynasty moved for summary
judgment on Lennar=s extra-contractual claims. 
Lennar pleaded three extra-contractual claims: (A) common-law negligent
misrepresentation; (B) violations of former article 21.21 of the Texas
Insurance Code; and (C) violations of former article 21.55 of the Texas
Insurance Code.[59]

A.        Common-Law
Negligent Misrepresentation

The elements of a negligent misrepresentation claim are as
follows:  (1) the defendant made a
representation in the course of its business, or in a transaction in which it
had a pecuniary interest; (2) the defendant supplied false information for the
guidance of others in their business; (3) the defendant did not exercise
reasonable care or competence in obtaining or communicating the information;
and (4) the plaintiff suffered pecuniary loss by justifiably relying on the
representation.  Roof Sys., Inc. v.
Johns Manville Corp., 130 S.W.3d 430, 438 (Tex. App.CHouston [14th Dist.] 2004, no pet.)
(citing Fed. Land Bank Ass=n v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991)).

American Dynasty moved for summary judgment on no-evidence
grounds as to Lennar=s negligent misrepresentation claim.  In response, Lennar alleged that American
Dynasty made (1) misrepresentations during the underwriting process, and (2)
misrepresentations regarding its reasons for terminating, and seeking to
rescind, the policy.

1.         Misrepresentations
During Underwriting Process








Lennar alleges that American Dynasty made misrepresentations
during the underwriting process by failing to inform Lennar that it did not
intend to insure Lennar for EIFS claims. 
Lennar cites two letters written by Karen Ralston, the American Dynasty
underwriter for the Lennar policy. 
During the underwriting process, Ralston communicated with Mary Pulley,
an employee of the Awholesale broker.@ 
Pulley, in turn, communicated with the Aretail broker.@ 
Therefore, the Aretail broker@ communicated with Lennar. 
Ralston sent a Aquotation letter@ and a Abinder letter@ to Pulley.  In the letters, Ralston did not affirmatively
state that American Dynasty would insure EIFS claims.  However, Ralston did not state that American
Dynasty would not insure EIFS claims. Lennar argues that Ralston=s failure to state that EIFS claims
would not be covered was, in effect, a misrepresentation that EIFS claims would
be covered.  We disagree.

The letters do not constitute misrepresentations by
omission.  In the letters, Ralston
outlined the conditions under which American Dynasty would bind the
policy.  Lennar emphasizes that none of
these conditions mention EIFS.  However,
Ralston did not purport to set forth the conditions under which claims would be
covered once the policy was issued. 
Rather, Ralston set forth five conditions under which American Dynasty
would bind the policy in the first place.[60]  Therefore, in outlining these conditions,
Ralston did not misrepresent that EIFS claims would be covered.  We cannot read the letters as
misrepresentations merely because Ralston did not set forth every possible type
of claim that might not be covered under the policy.








Lennar also asserts that American Dynasty=s failure to include an EIFS
exclusion in the policy amounted to a misrepresentation that EIFS claims would
be covered.  However, as we have
discussed, American Dynasty relies on several portions of the policy to dispute
coverage even though the policy does not contain an EIFS exclusion.  Therefore, the absence of an EIFS exclusion
is not a representation that the policy would cover EIFS claims.  Accordingly, Lennar has failed to present any
evidence of misrepresentations during the underwriting process.

2.         Misrepresentations
Concerning Termination and Rescission         

Lennar also contends that American Dynasty made
misrepresentations concerning its reasons for terminating, and seeking to
rescind, the policy.  Ralston first
learned on March 10, 2000 that Lennar was requesting coverage for EIFS
claims.  Three days later, American
Dynasty decided to terminate the policy. 
On May 12, 2000, Ralston wrote to Lennar explaining American Dynasty=s reasons for terminating the policy:

During the underwriting process . . .
, Lennar Corp. represented that it had not used [EIFS] in its home building
projects and had no plans for use of EIFS in future projects. . . . Subsequent
to the issuance of the subject policy, American Dynasty learned that Lennar
Corp. was, in fact, using EIFS applications in one or more of its Texas
projects.  If true facts had been disclosed
to American Dynasty During [sic] the underwriting process, American Dynasty
would not have issued the policy, would not have issued the policy at the same
premium rate, and/or would not have provided coverage with respect to EIFS
applications.  For these reasons, the
subject policy was canceled. . . . Moreover, because American Dynasty learned
subsequent to the issuance of the policy that Lennar Corp.=s representation concerning past and
future used [sic] of EIFS appellations was untrue, the risk covered by the
policy has substantially changed.  This
substantial change in risk constituted a separate reason for cancellation.








The termination was prospective only.  However, an American Dynasty claims
representative subsequently decided to seek rescission of the policy ab
initio for the same reasons. 
American Dynasty filed suit against Lennar in Florida seeking to rescind
the policy.  In the petition, American
Dynasty alleged ALennar Corp., through its insurance broker, represented to
American Dynasty in April 1999 that Lennar Corp. and its affiliates and
subsidiaries had never used [EIFS] in its homebuilding projects.  (That representation proved to be false).@[61]

In short, when terminating, and seeking to rescind, the
policy, American Dynasty accused Lennar of making untrue statements regarding
its use of EIFS.  Lennar contends that
American Dynasty=s accusations were misrepresentations because Lennar did not
make such statements.  Lennar presented
more than a scintilla of evidence that it did not make such statements, at
least with respect to all Lennar entities at issue.[62]  Accordingly, there is a genuine issue of
material fact on whether American Dynasty made false representations by
accusing Lennar of making untrue statements regarding its use of EIFS.








In spite of this fact issue, Lennar still cannot prevail on
this claim because it presented no evidence that it suffered any pecuniary loss
by relying on American Dynasty=s representations as required to sustain a cause of action
for common-law negligent misrepresentation.[63]  See Roof Sys., Inc., 130 S.W.3d at
438.  American Dynasty relied on its own
impression that Lennar had made false statements regarding its use of EIFS when
deciding to terminate and rescind the policy. 
However, American Dynasty made the alleged misrepresentations after
deciding to terminate and rescind the policy when explaining its reasons for
doing so.  Although Lennar claims it was
damaged by American Dynasty=s terminating, and seeking to rescind, the policy, Lennar
presented no evidence it was damaged by relying on American Dynasty=s alleged misrepresentations.[64]  Cf. MCN Energy Enters., Inc. v.
Omagro de Colombia, L.D.C., 98 S.W.3d 766, 771B72 (Tex. App.CFort Worth 2003, pet. denied)
(holding manufacturing company proved pecuniary loss as a result of reliance on
investor=s misrepresentation that it would
join company in operating plant because company spent millions developing the
plant in response).  Therefore, Lennar
failed to present evidence to support all elements of its common-law negligent
misrepresentation claim.  Consequently,
the trial court properly granted summary judgment for American Dynasty on this
claim.

B.        Texas
Insurance Code Article 21.21








Lennar has asserted a cause of action under former article
21.21 of the Texas Insurance Code.[65]  Section 3 of former article 21.21 prohibits
an insurer from engaging in any trade practice which is defined in article 21.21
to be Aan unfair or deceptive act or
practice in the business of insurance.@[66] 
Section 4 of former article 21.21 lists the acts which constitute Aunfair and deceptive acts or
practices in the business of insurance.@[67]  
Section 16(a) of former article 21.21 also incorporates the Adeceptive acts or practices@ enumerated in section 17.46(b) of the
DTPA.[68]  An insured who has sustained actual damages
as a result of an unfair or deceptive act or practice enumerated in section 4
of article 21.21, or in section 17.46(b) of the DTPA, may maintain an
action.  See Tex. Ins. Code Ann. art. 21.21, ' 16(a).

Lennar contends that American Dynasty violated sections 4(1),
4(10)(i), 4(10)(viii), and 4(11) of article 21.21, and sections 17.46(b)(5) and
17.46(b)(12) of the DTPA.  American
Dynasty also moved for summary judgment as to these claims on no-evidence
grounds.  In response, Lennar contends
the following conduct supports these claims: (1) American Dynasty=s alleged misrepresentations during
the underwriting process; (2) American Dynasty=s alleged misrepresentations
concerning termination and rescission; and (3) American Dynasty=s alleged failure to conduct an
adequate investigation before terminating, and seeking to rescind, the policy.[69]

1.         Misrepresentations
During the Underwriting Process

(Sections 4(1), 4(11), 17.46(b)(5) and 17.46(b)(12)) 








Apparently, Lennar cites American Dynasty=s alleged misrepresentations during
the underwriting process to support its claims under sections 4(1) and 4(11) of
article 21.21 and sections 17.46(b)(5) and 17.46(b)(12) of the DTPA, as
incorporated in article 21.21.  All of
these sections prohibit some type of a misrepresentation regarding the policy
or its provisions.  See Tex. Ins. Code Ann. art. 21.21, ' 4(1) (Amisrepresenting the terms of any
policy issued or to be issued or the benefits or advantages promised thereby@); Tex.
Ins. Code Ann. art. 21.21, ' 4(11) ( A[m]isrepresenting an insurance policy@); Tex.
Bus. & Com. Code Ann. ' 17.46(b)(5) (representing goods or
services have Acharacteristics@ or Abenefits@ which they do not have); Tex. Bus. & Com. Code Ann. ' 17.46(b)(12) (Arepresenting that an agreement
confers or involves rights, remedies, or obligations which it does not have or
involve@).








Lennar has presented no evidence American Dynasty made any
misrepresentations regarding the policy or its provisions.  Specifically, we have already determined that
American Dynasty did not make any misrepresentations during the underwriting
process by failing to inform Lennar that the policy would not cover EIFS
claims.  In the absence of some specific
misrepresentation by the insurer about the insurance, an insured=s mistaken belief about the scope or
availability of coverage is not generally actionable under the Insurance Code
or the DTPA.  Moore v. Whitney‑Vaky
Ins. Agency, 966 S.W.2d 690, 692B93 (Tex. App.CSan Antonio 1998, no pet.) (holding
insurance agent=s failure to tell insured that liability policy did not cover
employee retaliatory discharge claims was not actionable under Insurance Code
or DTPA where insured admitted that agent never told him the policy would cover
all lawsuits); see United Servs. Auto. Ass=n v. Lambert, No. 03-97-00811-CV, 1999 WL 695704,
*7B8 (Tex. App.CAustin Aug. 26, 1999, no pet.) (not
designated for publication) (holding that insurer=s failure to inform insured that
policy would not cover testing for plumbing problems, after insured told
insurer it planned to obtain the testing, was not actionable misrepresentation);
cf. State Farm Fire & Cas. Co. v. Gros, 818 S.W.2d 908, 912B13 (Tex. App.CAustin 1991, no writ) (finding agent=s representation to insured homeowner
that damage would be covered if boulders, which fell into their driveway, had
hit their home supported claims under article 21.21 and DTPA, when boulders
subsequently did hit their home, but coverage was denied).

Therefore, Lennar has presented no evidence to support its
claims under sections 4(1) and 4(11) of article 21.21, and sections 17.46(b)(5)
and 17.46(b)(12) of the DTPA, as incorporated in article 21.21.  Accordingly, the trial court properly granted
summary judgment for American Dynasty on these claims.

2.         Misrepresentations
Concerning Termination and Rescission 

(Section 4(10)(i))

Lennar also contends that American Dynasty=s alleged misrepresentations
concerning its reasons for terminating, and seeking to rescind, the policy
violated section 4(10) of article 21.21. 
Section 4(10) prohibits Aunfair settlement practices with respect to a claim by an
insured@ and enumerates the actions which
constitute Aunfair settlement practices.@ 
Tex. Ins. Code Ann. art.
21.21, ' 4(10).  Apparently, Lennar cites American Dynasty=s alleged misrepresentations to
support its claim under section 4(10)(i). 
Section 4(10)(i) prohibits an insurer from Amisrepresenting to a claimant a
material fact or policy provision relating to coverage at issue.@ 
Id. ' 4(10)(i).








However, American Dynasty=s representations did not concern
coverage for the EIFS claims.  Rather,
the representations concerned American Dynasty=s reasons for terminating, and
seeking to rescind, the policy in general. 
We do not read section 4(10)(i) as encompassing misrepresentations
concerning termination, or rescission, of a policy in general.  See id.  Further, even if section 4(10)(i) did
encompass American Dynasty=s representations concerning termination and rescission,
again, Lennar presented no evidence that it suffered any damages as a result of
the representations.[70]  Therefore, Lennar failed to present evidence
to support all elements of its section 4(10)(i) claim.  Consequently, the trial court properly
granted summary judgment on this claim.

3.         Termination and
Attempted Rescission

(Section 4(10)(viii))

Lennar apparently complains of the actual termination and
attempted rescission to support a claim under section 4(10)(viii).  Section 4(10)(viii) prohibits an insurer from
Arefusing to pay a claim without
conducting a reasonable investigation with respect to the claim.@ 
Tex. Ins. Code Ann. art.
21.21, ' 4(10)(viii).  Lennar argues that American Dynasty did not
reasonably investigate whether Lennar actually made untrue statements regarding
its use of EIFS before deciding to terminate and rescind the policy.[71]

However, section 4(10)(viii) focuses on an insurer=s refusal to pay a particular claim
without conducting a reasonable investigation. 
See id.  Section
4(10)(viii) does not prohibit, or even mention, an insurer=s terminating, or rescinding, a
policy without conducting a reasonable investigation.  See id.  Nevertheless, Lennar cites Union Bankers
Insurance Co. v. Shelton, in which the Texas Supreme Court held that an
insured has a bad faith cause of action when an insurer cancels a policy
without a reasonable basis, and the insurer knew or should have known of that
fact.  889 S.W.2d 278, 283 (Tex.
1994).  Lennar argues that this rule
should apply equally to article 21.21 claims. 
We disagree.








While wrongful termination may be actionable in common-law bad
faith, article 21.21, section 4 is an exclusive list of statutory Aunfair or deceptive acts or practices@ actionable under article 21.21.  See Tex.
Ins. Code Ann. art. 21.21, '' 4, 16; Tri‑Legends Corp. v.
Ticor Title Ins. Co. of California, 889 S.W.2d 432, 440 (Tex. App.CHouston 14th Dist.] 1994, writ
denied) (citing Allstate Ins. Co. v. Watson, 876 S.W.2d 145, 147 (Tex.
1994)).  Article 21.21, section 4, and
particularly section 4(10)(viii), does not include terminating, or rescinding,
a policy without conducting a reasonable investigation as actionable conduct.  See Tex.
Ins. Code Ann. art. 21.21, ' 4.[72]  Because the Legislature and Texas Supreme
Court have not made wrongful termination or rescission of a policy actionable
under article 21.21, we decline to do so now.[73]  Therefore, Lennar failed to present evidence
to support its section 4(10)(viii) claim, and the trial court properly granted
summary judgment on this claim.

C.        Texas
Insurance Code Article 21.55

Finally, American Dynasty moved for summary judgment on
traditional grounds as to Lennar=s cause of action under former
article 21.55 of the Texas Insurance Code.[74]  Article 21.55 imposes requirements on an
insurer with respect to responding to claims, accepting or rejecting claims,
and promptly paying accepted claims.  Tex. Ins. Code Ann. art. 21.55, '' 2, 3, 4.  Article 21.55 prescribes penalties for an
insurer=s non-compliance.  Id. ' 6. 
Article 21.55 defines a Aclaim@ as Aa first party claim made by an insured or a
policyholder under an insurance policy . . . that must be paid by the insurer
directly to the insured.@  Id. ' 1(3) (emphasis added).








Lennar asserts that American Dynasty=s failure to timely indemnify Lennar
for the EIFS claims violated article 21.55. 
American Dynasty contends that Lennar has no article 21.55 cause of
action as a matter of law because the EIFS claims are third-party claimsCnot first-party claims.

Article 21.55 does not define Afirst party claim.@ 
See id. ' 1.  However, several
courts have recognized that a first‑party claim is one in which an
insured seeks recovery for the insured=s own loss.  See Hartman v. St. Paul Fire and
Marine Ins. Co., 55 F. Supp. 2d 600, 603 (N.D. Tex. 1998); Universe Life
Ins. Co. v. Giles, 950 S.W.2d 48, 53 n.2 (Tex. 1997).  The classic example of first‑party
insurance is property insurance.  Hartman,
55 F. Supp. 2d at 603 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes= Appleman
on Insurance 2d ' 3.2 (1st ed. 1996)). 
The insurance proceeds are paid by the first‑party insurer
directly to the insured to redress the insured=s actual, direct loss.  See id. (citing Holmes, ' 3.2); see also Black=s Law
Dictionary 804 (7th ed.
1999) (defining Afirst-party insurance@ as Aa policy that applies to oneself or
one=s own property, such as life
insurance, health insurance, disability insurance, and fire insurance.@).

In contrast, a third-party claim is one in which an insured
seeks coverage for injuries to a third party.  See Hartman, 55 F. Supp. 2d at 603 (citing
Holmes, ' 3.3); Giles, 950 S.W.2d at 53
n.2.  If the third party reduces its
claim to a judgment or settlement, the insured will suffer a loss.  Hartman, 55 F. Supp. 2d at 603 (citing
Holmes, ' 3.3).  However, the insured=s loss is Aindirect,@ and the third party=s loss is Adirect.@ 
Id. (citing Holmes, ' 3.3).  The liability insurer reimburses its insured
for the insured=s indirect loss, but payment in practical effect runs
directly to the third‑party claimant.  Id. (citing Holmes, ' 3.3).








American Dynasty argues that based on these definitions, claims
under a liability policy are third-party claimsCnot first party claims.  In response, Lennar notes that several courts
have held that a claim under a liability policy may be a first-party
claim.  However, these cases involve an
insured=s request for a defense under a
liability policy.  See, e.g., Rx.Com,
Inc. v. Hartford Fire Ins. Co., 364 F.Supp. 2d 609, 611B20 (S.D. Tex. 2005) (holding insured=s request for a defense from
liability insurer was first-party claim for purposes of article 21.55 and
citing numerous federal courts applying Texas law that have held the same);
N. County Mut. Ins. Co. v. Davalos, 84 S.W.3d 314, 319 (Tex. App.CCorpus Christi 2002), rev=d on other grounds, 140 S.W.3d 685 (Tex. 2004)
(applying article 21.55 to insured=s claim against liability insurer for
failure to defend).  In fact, the courts
in this state disagree over whether an insured=s request for a defense under a
liability policy can be a first-party claim for purposes of article 21.55.  Compare, e.g., Rx.Com, Inc., 364 F.Supp.
2d 611B20; Davalos, 84 S.W.3d at 319;
with TIG Ins. Co. v. Dallas Basketball, Ltd., 129 S.W.3d 232, 239B42 (Tex. App.CDallas 2004, pet. denied) (holding
insureds= claim against liability insurer for
reimbursement of defense costs after insurer refused to defend underlying
action was not first‑party claim). 
The Texas Supreme Court recently accepted a certified question from the
Fifth Circuit on this issue.  See Lamar
Homes, 428 F.3d 193.  However,
resolution of this issue is irrelevant to our analysis.

We conclude that even if a request for a defense can be a
first-party claim for purposes of article 21.55, Lennar=s request for indemnification for the
EIFS claims is a third-party claim. 
Courts holding that a request for a defense is a first-party claim
recognize that the insured is seeking defense costs, which are paid either to,
or for the benefit of, the insured. See Rx.Com, Inc., 364 F.Supp. 2d at
616B18. 
Thus, the insured seeks payment for its own loss although the underlying
claim was brought by a third-party.  See
id.  Consequently, although liability
policies are termed Athird‑party@ policies, the duty to defend is a
form of first‑party insurance contained within the liability policy.  See id.








In contrast, Lennar=s article 21.55 claim is based on a
request for indemnificationCnot a request for a defense. 
Lennar does not seek payment for direct losses that it suffered.[75]  Rather, Lennar seeks indemnification for the
damages it paid to the homeowners. 
Therefore, it seeks payment for direct losses suffered by third-parties.  See Hartman, 55 F. Supp. 2d at 603;[76]
Giles, 950 S.W.2d at 53 n.2.

Nonetheless, Lennar characterizes its request for
indemnification as a first-party claim because the policy proceeds will be paid
directly to Lennar.  Lennar suggests that
article 21.55 defines a first-party claim as one in which the proceeds will be
paid directly to the insured.  However,
Lennar incorrectly reads article 21.55. 
Article 21.55 has two separate requirements for its application:  the claim is a first party claim and
the policy proceeds are paid directly to the insured.  See Tex.
Ins. Code Ann. art. 21.55, ' 1(3).

If coverage exists under the American Dynasty policy, the
proceeds will be paid to Lennar only because it settled the EIFS claims before
seeking indemnification from American Dynasty. 
American Dynasty will still, in effect, be paying for direct losses suffered
by third-parties.  Therefore, we reject
Lennar=s reasoning that the EIFS claims were
transformed from third-party claims into first-party claims merely by Lennar=s paying the claims before seeking
indemnification from American Dynasty. 
Consequently, the trial court properly granted summary judgment on
Lennar=s article 21.55 claim.

In sum, the trial court properly granted summary judgment in
favor of American Dynasty on all Lennar=s extra-contractual claims.

 

 








XI. 
Conclusion

We overrule Lennar=s first issue and affirm the denial
of Lennar=s motion for summary judgment as to
all carriers.

We sustain, in part, and overrule, in part, Lennar=s second issue.  Specifically, we affirm the summary judgments
in favor of Gerling, RLI, ICSOP, and Westchester.  We reverse the summary judgment in favor of
American Dynasty/Great American on coverage issues and remand for further
proceedings consistent with this opinion. 
We reverse the summary judgment in favor of Markel and remand for further
proceedings consistent with this opinion.

We overrule Lennar=s third issue and affirm the summary
judgment in favor of American Dynasty/Great American on Lennar=s extra-contractual claims.

 

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered and Substitute
Majority Opinion filed February 23, 2006.

Panel consists of Justices Fowler,
Edelman and Seymore.  (Edelman, J.,
concurring and dissenting opinion to follow.)

 











[1]  Lennar
Corporation is the parent of many entities. 
The homes were initially built by Lennar subsidiaries, Village Builders,
Inc. or Houston Village Builders, Inc., which eventually merged into Lennar
Homes of Texas Land & Construction, Limited, one of the parties to this
case.  Lennar Homes of Texas Land &
Construction, Limited continued building the homes under the names AVillage Builders@ or AHouston Village Builders, Inc.@  Upon
completion of a home, Lennar Homes of Texas Land & Construction, Limited
transferred title to Lennar Homes of Texas Sales and Marketing, Limited, also a
party to this case, which, in turn, transferred title to the homeowners.  We will refer to the Lennar entities
collectively as ALennar.@





[2]  Great American
is an affiliate of American Dynasty although not a separate insurer of Lennar,
so we will refer to these carriers collectively as AAmerican Dynasty.@





[3]  Of the
approximately 400 homes involved, only two homeowners filed suit against
Lennar.





[4]  Although
Lennar replaced EIFS on most homes without suit being filed, for consistency,
we will refer to the AEIFS claims.@  We note that Lennar paid cash settlements to
a few homeowners; however, in most cases, Lennar paid contractors to replace
EIFS and/or make repairs.  Nonetheless,
we will also refer to Lennar=s resolution of all the claims as Asettlements.@





[5]  American
Dynasty and Markel also filed counterclaims to rescind their policies alleging
Lennar misrepresented that it did not use EIFS and failed to disclose the EIFS
claims when it purchased the policies. 
Lennar, American Dynasty, and Markel moved for summary judgment on the
rescission counterclaims.  The trial
court denied these motions for summary judgment and severed the rescission
counterclaims into a separate action pending this appeal.





[6]  Because the
trial court resolved Lennar=s request for a declaratory judgment via summary
judgments, we also review denial of the request for declaratory judgment under
summary judgment standards.  See
Lidawi v. Progressive County Mut. Ins. Co., 112 S.W.3d 725, 730 (Tex. App.CHouston [14th Dist.] 2003, no pet.); Tex. Civ. Prac. & Rem. Code Ann. ' 37.010 (Vernon 1997).





[7]  Lennar filed a
traditional motion for summary judgment. 
The carriers= motions contained both traditional and no evidence
grounds.  When we address the individual
motions, we will note when a ground is a no-evidence ground.





[8]  The wordings
of the insuring agreements vary slightly, but they are essentially the same.





[9]  We note that
one carrier, American Dynasty, argues that Florida law applies to the Aoccurrence@ issue
under its policy. American Dynasty does not urge application of Florida law to
any other coverage issues.  Lennar has
presented a separate issue, its fourth issue, contending that Texas law
applies.  We must make a conflicts‑of‑laws
decision only when the laws of the states in question differ on one or more
points in issue.  Greenberg Traurig of
New York, P.C. v. Moody, 161 S.W.3d 56, 69B70 (Tex.
App.CHouston [14th Dist.] 2004, no pet.).  Thus, we will first consider whether there is
an Aoccurrence@ under
Texas law, then consider whether Florida law differs from Texas law.





[10]  We will
discuss the carriers= arguments together because they are interrelated; in
essence, the carriers argue that defective construction resulting in damage to
the insured=s own work is not an Aoccurrence.@  Apparently,
the carriers acknowledge that defective construction can constitute an Aoccurrence@ when it
results in damage to the work of a third-party. 
See generally Federated Mut. Ins. Co. v. Grapevine Excavation,
Inc., 197 F.3d 720 (5th Cir. 1999); E & R Rubalcava Constr., Inc. v.
The Burlington Ins. Co., 147 F. Supp. 2d 523 (N.D. Tex. 2000).





[11]  We have found
numerous cases and articles showing there is also a conflict nationwide on this
issue.  Compare, e.g., Clifford J.
Shapiro, Point/Counterpoint: Inadvertent Construction Defects Are An AOccurrence@
Under CGL Policies, 22-SPG-Constr. Law. 13 (2002), with
Linda B. Foster, Point/Counterpoint: No Coverage under the CGL Policy for
Standard Construction Defect Claims, 22-SPG-Constr.
Law. 18 (2002). 





[12]  However, the
First Court of Appeals, which decided Hartrick, recently found that
unintentionally defective construction may constitute an Aoccurrence.@  See Archon Invs., Inc. v. Great Am. Lloyds
Ins. Co., 174 S.W.3d 334, 342 (Tex. App.CHouston
[1st Dist.] 2005, pet. filed).





[13]  In Jim
Johnson Homes, the insured=s actions could arguably be characterized as
intentional, and, thus, not accidental, because the insured failed to follow plans
and specifications in many respects.  See
244 F. Supp. 2d at 710B11. 
Nonetheless, the court seemed to generally hold that construction
deficiencies resulting in damage to the insured=s work
cannot constitute an occurrence.  See
id. at 714B19.





[14]  Several other
courts applying Texas law have found that defective construction resulting in
damage to the insured=s work does not constitute an Aoccurrence.@  See, e.g., Courtland Custom Homes, Inc. v.
Mid‑Continent Cas. Co., 395 F. Supp. 2d 478, 484B86 (S.D. Tex. 2005); Mid Arc, Inc. v. Mid‑Continent
Cas. Co., No. A‑03‑CA‑242‑SS, 2004 WL 1125588, at
*7 (W.D. Tex. Feb 25, 2004) (not designated for publication).





[15]  The carriers
attempt to distinguish Lennar=s cases arguing they involved the duty to defend when
the claimant=s allegation was negligence, whereas this case
involves the duty to indemnify when the only basis for Lennar=s liability is breach of contract.  See Cowan, 945 S.W.2d at 821B22 (stating duty to defend is based on factual
allegations in the pleadings, whereas duty to indemnify is based on actual
facts establishing the insured=s liability in the underlying suit).  At one point, in the cases cited by Lennar,
the courts distinguished, in part, the cases cited here by the carriers because
they involved indemnification obligations after jury findings of liability for
breach of contract, as opposed to general negligence allegations.  See generally Calli Homes,
235 F. Supp. 2d at 698B702; Gehan Homes, 146 S.W.3d at 839B43; Main Street Homes, 79 S.W.3d at 694B95.  However, in
the cases cited by Lennar, the courts also distinguished the cases cited here
by the carriers because they involved intentional, as opposed to generally
negligent or inadvertent, construction defects; and the courts suggested the
proper focus is on negligent vs. intentional defects, as opposed to negligence
vs. breach of contract.  See generally
Calli Homes, 236 F. Supp. 2d at 698B702; Gehan
Homes, 146 S.W.3d at 839B43; Main Street Homes, 79 S.W.3d at 692B95.  As we will
explain, we believe the proper focus is on negligent vs. intentional
defects.  In any event, Lennar=s cases negate the carriers= argument that Texas law has established defective
construction can never constitute an Aoccurrence.@  See Mid Arc,
2004 WL 1125588, at *5 (finding Hartrick and Main Streets Homes
conflicting despite suggestion they are reconcilable because Hartrick
involved the duty to indemnify whereas Main Street Homes involved the
duty to defend).





[16]  Several other
courts applying Texas law have held that defective construction resulting in
damage to the insured=s work can constitute an Aoccurrence.@  See, e.g., Ins. Co.  of N. Am. v. McCarthy Bros. Co., 123 F.
Supp. 2d 373, 376B77 (S.D. Tex. 2000); Archon Invs., Inc., 174
S.W.3d at 342; Home Owners Mgmt. Enters., Inc. v. Mid‑Continent Cas.
Co., No. CIV. A. 304CV2061BFH, 2005 WL 2452859, at *3B6 (N.D. Tex. Oct. 3, 2005); Mid‑Continent
Cas. Co. v. JHP Dev., Inc., No. Civ.A.SA04CA‑192‑XR, 2005 WL
1123759, at *1B4 (W.D. Tex. Apr. 21, 2005) (not designated for
publication); Luxury Living, Inc. v. Mid‑Continent Cas. Co., No.
Civ. A. H‑02‑3166, 2003 WL 22116202, at *13B16 (S.D. Tex. Sept. 10, 2003) (not designated for
publication); see also Tealwood Constr., Inc. v. Scottsdale Ins. Co.,
No. Civ.A.3:02‑CV‑2159‑L, 2003 WL 22790856, at *5B7 (N.D. Tex. Nov. 19, 2003) (not designated for
publication) (finding no Aoccurrence@ in this
case but not foreclosing possibility defective construction can constitute an Aoccurrence@); Acceptance
Ins. Co. v. Newport Classic Homes, Inc., No. Civ.A.3:99‑CV‑2010BC,
2001 WL 1478791, at *3B4 (N.D. Tex. Nov. 19, 2001) (not designated for
publication) (same).





[17]  In American
Girl, the insured contractor=s faulty
building site preparation, based on faulty advice from a subcontractor, caused
the foundation to sink resulting in extensive damage.  673 N.W.2d at 71B72.  After a
thorough analysis, the Wisconsin Supreme Court concluded that the faulty
construction constituted an Aoccurrence@ despite
arguments by the insurers that were similar to the carriers= arguments in this case.  See id. at 73B78.  We will
cite American Girl throughout this opinion because we agree with its
analysis; as we will demonstrate, the court properly considered the entire CGL
policy.  See id.





[18]  Nonetheless,
some courts suggest that damage to the insured=s own
work from failure to properly perform a construction contract is presumed to be
expected while damage to the work or property of a third-party is presumed to
be unexpected.  See, e.g., Burlington
Ins. Co. v. Oceanic Design & Constr., Inc., 383 F.3d 940, 948B49 (9th Cir. 2004) (applying Hawaii law); Nabholz
Constr. Corp. v. St. Paul Fire & Marine Ins. Co., 354 F. Supp. 2d 917,
921B22 (E.D. Ark. 2005); see also Hartrick, 62
S.W.3d at 277B78.  However, we
do not see how damage to the insured=s own
work is any more expected than damage to the work or property of a third-party
if the faulty construction was inadvertent. 
See Erie Ins. Exch. v. Colony Dev. Corp., 736 N.E.2d 950, 952 n.1
(Ohio Ct. App. 2000) (supp. op. on rehearing) (noting the Alogical basis@ for
distinction between damage to the insured=s work
and collateral property is Aless than clear@ because
they are both caused by negligent work). 
Moreover, this suggestion runs afoul of the Aaccident@
framework under Texas law.  We do not
examine whether the damage was expected from the improper, i.e. negligent,
performance of the contract.  See
Harken, 261 F.3d at 472B73 (citing Cowan, 945 S.W.2d at 828; Orkin,
416 S.W.2d at 400).  If that were the
case, there would not be liability coverage for most negligent acts because
damage from a negligent act will likely be reasonably expected.  In fact, proof that the actor should have
reasonably anticipated the resulting injury is one aspect of the proximate
cause element of a negligence claim.  See
Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex.
1995).  Instead, we examine whether the
damage was expected if the work was performed properly, i.e.
non-negligently.  See Harken, 261
F.3d at 472B73 (citing Cowan, 945 S.W.2d at 828; Orkin,
416 S.W.2d at 400).





[19]  With certain
exceptions, the Aproducts-completed operations hazard@ includes all A>property
damage= occurring away from premises you own or rent and
arising out of >your product= or >your work= . . . .@





[20]  As we will
further discuss, this exclusion now contains a subcontractor exception that has
modified the exclusion.





[21]  One such
exclusion precludes coverage for Aproperty
damage@ to Athat particular part of real property on which you or
any contractors or subcontractors working directly or indirectly on your behalf
are performing operations, if the property damage arises out of those
operations.@  Another
exclusion precludes coverage for Athat
particular part of any property that must be restored, repaired, or replaced
because >your work= was
incorrectly performed on it@ if the Aproperty
damage@ is not included in the Aproducts-completed
operations hazard.@  





[22]  In Jim
Johnson Homes, the court found that the exclusions applicable to
deficiencies arising during construction would preclude coverage because the
project was not completed; however, the court had already concluded there was
no occurrence.  See 244 F. Supp.
2d at 717B 18. 





[23]  The exclusions
for damage arising during construction do not contain a subcontractor
exception.





[24]  Here, all the
policies, except the ICSOP policy, contain the standard Abusiness risk@
exclusions,  including the Ayour work@
exclusion and its subcontractor exception. 
The ICSOP contains the BFPD, and, thus, effectively includes a
subcontractor exception to the Ayour work@
exclusion.  See Mid‑United
Contractors, 754 S.W.2d at 827; see also Am. Girl, 673 N.W.2d at 83.





[25]  See also,
e.g., Limbach Co., LLC v. Zurich Am. Ins. Co., 396 F.3d 358, 362B63 (4th Cir. 2005) (applying Pennsylvania law); Fid.
& Deposit Co. of Md. v. Hartford Cas. Ins. Co., 189 F. Supp. 2d 1212,
1219 (D. Kan. 2002); Fejes v. Alaska Ins. Co. Inc., 984 P.2d 519, 522B24 (Ak. 1999); Kalchthaler v. Keller Constr. Co.,
591 N.W.2d 169, 174B76 (Wisc. Ct. App. 1999).





[26]  We recognize
that some jurisdictions have held the opposite, reasoning that an exception to
an exclusion cannot create coverage where none otherwise exists under the
initial Ainsuring agreement.@  See, e.g., ACS Constr. Co. v. CGU, 332 F.3d 885, 891B92 (5th Cir. 2003) (applying Mississippi law);
Nabholz, 354 F. Supp. 2d at 921B23;
Amerisure, Inc. v. Wurster Constr. Co., Inc., 818 N.E.2d 998, 1005 (Ind.
Ct. App.); see also, e.g., Burlington Ins. Co., 383 F.3d at 945B53; Union Ins. Co. v. Hottenstein, 83 P.3d
1196, 1201B02 (Colo. Ct. App. 2003); Pursell Constr., Inc. v.
Hawkeye‑Sec. Ins.Co., 596 N.W.2d 67, 70B71 (Iowa
1999); L‑J, Inc. v. Bituminous Fire and Marine Ins. Co., 621 S.E.
2d 33, 35B37 (S.C. 2005). 
However, their reasoning is contrary to the principle that we consider
the whole policy to ascertain the parties= intent
and give effect to all parts, so that none will be rendered superfluous and
meaningless.  See King, 85 S.W.3d
at 192B93; Forbau, 876 S.W.2d at 133; Betco
Scaffolds, 29 S.W.3d at 344; see also J.S.U.B., Inc. v. United States
Fire Ins. Co., 906 So.2d 303, 309B10 (Fla.
Dist. Ct. App. 2005) (recognizing exclusion cannot create coverage but
considering subcontractor exception under principle that all parts of an
insurance policy must be read in harmony). 
Moreover, the subcontractor exception does not create coverage where
none otherwise exists under the Ainsuring
agreement.@  Rather, it
restores coverage that originally existed under the broad Ainsuring agreement,@ but was
precluded by the Ayour work@
exclusion.   See Am. Girl, 673
N.W.2d at 83B84.





[27]  The
subcontractor exception restores coverage only for property damage arising
after the project is completed because only the Ayour
work@ exclusion contains the subcontractor exception, and
the Ayour work@
exclusion applies to the Aproducts completed operations hazard.@





[28]  For example,
we would likely agree with the result in Jim Johnson Homes based on its
recited facts although we disagree with the court=s
suggestion that no damage arising from defective construction  can result from an occurrence.  There, the claimants sought rescission of the
contract and return of various amounts paid before construction was complete
based on the insured contractor=s abandonment of the project and failure to build
according to the contract.  See Jim
Johnson Homes, 244 F.Supp. 2d 710B12.  The damages sought did not result from Aproperty damage@ arising
after completion of the project.  Therefore,
requiring indemnification by the insurer could have effectively transformed the
CGL policy into a performance bond in the Jim Johnson Homes scenario.





[29]  We must note
that we question whether the rationale for adding the subcontractor exception
applies here.  The rationale is that the
contractor can control its own performance but cannot necessarily control a
subcontractor=s performance.  See
Fireguard Sprinkler Systems, Inc. v. Scottsdale Ins. Co., 864 F.2d 648, 653B54 (9th Cir. 1988). 
Here, although subcontractors built the homes and installed the EIFS,
the EIFS-related damages did not result from any faulty application by the
subcontractors, but rather from the fact that EIFS is inherently
defective.  Lennar admits that it
selected EIFS to be installed on the homes although it did not know EIFS was
defective.  Nevertheless, the
subcontractor exception is quite broad and apparently is not limited to
situations where the subcontractor=s fault
caused the damage.  Instead, it merely
applies Aif the damaged work or the work out of which
the damage arises was performed on [Lennar=s]
behalf by a subcontractor.@  (emphasis
added).  In fact, except for ICSOP, none
of the carriers contend the Ayour work@
exclusion precludes coverage; presumably, they recognize it would not apply due
to the exception.  Although ICSOP
contends its Ayour work@
exclusion applies because there is no exception, there is no dispute here over
the breadth of the subcontractor exception. 
Further, any uncertainty over the breadth of the subcontractor exception
would be relevant to whether the Ayour
work@ exclusion appliesCnot
whether there was an occurrence.





[30]  We decline to
guess how Florida law would resolve the issue to determine whether its law
conflicts with Texas law.  Resolution of
the issue under Florida law is appropriately left to its own courts. 





[31]  AProperty damage@ is also
defined as A[l]oss of use of tangible property that is not
physically injured.@  Apparently,
none of the homeowners claimed Aloss of use@ due to
EIFS.





[32]  American
Dynasty moved for summary judgment on these overhead costs, inspection costs,
personnel costs, and attorneys= fees, as a separate ground.  RLI and Markel also mention in their motions
for summary judgment that there is no coverage for these costs.  However, we view the issue of coverage for
these costs as encompassed in the Aproperty
damage@ issue raised by Lennar and all carriers because
Lennar claims these costs are Adamages because of . . . property damage,@ for which it is entitled to indemnification.





[33]  Lennar
presented evidence that it incurred other costs to repair the water damage in
addition to the costs to actually repair the damaged areas.  For example, on some homes, windows were
broken, driveways were cracked, and landscaping was damaged to repair the water
damage. We characterize these costs as Adamages
because of . . . property damage.@  Further, in some cases, Lennar may have
removed some EIFS to access and repair underlying water damage or determine the
areas of underlying damage.  We
characterize these costs to remove EIFS solely to repair underlying water
damage as Adamages because of . . . property damage.@





[34]  Daris Horn
averred by affidavit that Aall homes at issue in this case@ had wood rot and/or substrate damage.  Horn also testified in her deposition that
every home had some damage to either sheathing, insulation, or framing.  Therefore, this evidence suggests there was Aphysical injury@ to
every home.  However, at another point,
Horn testified that Lennar measured damage by the moisture level in the
walls.  This testimony raises the
question of whether every home suffered water damage or whether some homes
merely accumulated moisture which could potentially cause damage.  In any event, Lennar established that at
least some homes sustained water damage.





[35]  Greg Eby, a
Lennar superintendent involved in replacing EIFS and repairing water damage to
the homes, testified it is the Asubstrate and beyond,@ not the
EIFS itself, that is damaged.  Donald
Klein, president of one of the Lennar entities, testified the Aactual rotting of the wood or growing of the mold@ is the Aproperty
damage.@





[36]  Until early
2000, when Lennar decided to replace all EIFS, Lennar addressed the
homes on an individual basis.  The
evidence is somewhat unclear as to the work performed on these homes.  Horn testified Lennar made Arepairs@ on a
few homes to areas where testing revealed high moisture content.  Although Horn characterized this work as Arepairs,@ her
testimony reflects some of these Arepairs@ may have actually been replacement of EIFS as a
preventative measure because the high moisture content might damage the
homes.  However, Horn also indicated
Lennar repaired water damage on some homes and in some cases, removed EIFS to
repair the damage.  In any event, Lennar
must also apportion its costs incurred before early 2000 between its costs to
repair water damage and its costs to replace EIFS as a preventative measure.





[37]  In their
motions for summary judgment, several carriers argued that Lennar was not Alegally obligated to pay@ the
EIFS claims because it settled them voluntarily without suits being filed.  According to Lennar, the Residential
Construction Liability Act (ARCLA@) legally obligated Lennar to cure construction
defects without suits being filed.  See
generally Tex. Prop. Code Ann.
' ' 27.001B.007
(Vernon 2000 & Supp. 2005).  On
appeal, the carriers no longer argue that Lennar was not legally obligated to
pay the EIFS claims.  Nonetheless, even
if Lennar was legally obligated to pay the EIFS claims, it was not legally
obligated to incur its own costs in connection with settling the claims.





[38]  Lennar asserts
that Maurice Pincoffs is a Afaulty
batch@ case whereas in defective design cases, courts have
found one Aoccurrence.@  However, Maurice Pincoffs did not
limit its ruling to Afaulty batch@ cases, see
generally, 447 F.2d 204, and Lennar cites no cases applying Texas law that
have limited Maurice Pincoffs to Afaulty
batch@ cases.  Rather,
Maurice Pincoffs instructs that we examine the number of events
resulting in the insured=s liability.  See
id. at 206.





[39]  See, e.g.,
Chemstar, Inc. v. Liberty Mut. Ins. Co., 41 F.3d 429, 431B33 (9th Cir. 1994) (holding insured=s supplying of lime plaster, which ultimately caused
plaster pitting in twenty-eight homes, constituted one Aoccurrence@);
Champion Int=l Corp. v. Cont=l
Cas. Co., 546 F.2d 502, 504B06 (2nd Cir. 1976) (holding insured=s sale of defective paneling to twenty-six
manufacturers of vehicles resulting in damage to 1,400 vehicles was one Aoccurrence@);
Colonial Gas Co. v. Aetna Cas. & Sur. Co., 823 F. Supp. 975, 983B84 (D. Mass. 1993) (holding insured utility=s use of insulation that was later banned constituted
one Aoccurrence@
although it was installed in 390 homes); Uniroyal, Inc. v. Home Ins. Co.,
707 F. Supp. 1368, 1380B87 (E.D.N.Y. 1988) (holding manufacturer=s numerous deliveries of Agent Orange to the military
constituted one Aoccurrence@ despite
insurer=s argument that each subsequent spraying in Vietnam
constituted a separate Aoccurrence.@); Transport
Ins. Co. v. Lee Way Motor Freight, Inc., 487 F. Supp. 1325, 1327B31 (N.D. Tex. 1980) (holding that under Oklahoma law,
insured=s practice of employment discrimination constituted
one Aoccurrence@ despite
multiple victims of discrimination and four work locations where discrimination
occurred); Household Mfg., Inc. v. Liberty Mut. Ins. Co., No. 85 C 8519,
1987 WL 6611, at *4B7 (N.D. Ill. Feb. 11, 1987) (not designated for
publication) (holding insured=s sale of defective plumbing systems which were
ultimately installed in numerous homes constituted one Aoccurrence@).





[40]  Apparently,
the chart filed by Lennar was updated to include a few additional homes not
included on the chart filed by Gerling.





[41]  RLI=s policy, effective August 1, 1998 to June 1, 1999,
has a policy limit of $25,000,000 per Aoccurrence@ and is excess to the Gerling policy.  ICSOP=s
policy, effective June 1, 1997 to August 1, 1998, has a policy limit of
$20,000,000 per Aoccurrence@ and is
excess to the Gerling policy. 
Westchester=s policy, effective June 1, 1995 to June 1, 1996, has
a policy limit of $5,000,000 per Aoccurrence.@  Unlike the RLI
and ICSOP policies, the Westchester policy is not excess to the Gerling policy
because the Westchester policy period precedes the Gerling policy period.  However, the primary policy underlying the
Westchester policy also had limits of $1 million per Aoccurrence@ and a
$250,000 SIR.





[42]  As we will
later discuss, our conclusion that each home constitutes a separate occurrence
is not dispositive of coverage under the American Dynasty and Markel policies
because the American Dynasty policy contains an aggregate SIR, and the Markel
policy is excess to the American Dynasty policy.





[43]  We note that
Westchester=s exhaustion ground is Ano
evidence,@ while RLI and ICSOP=s
exhaustion grounds are traditional. 
Regardless, the result is the same. 
With respect to the traditional motions, 
the summary judgment evidence shows, and Lennar effectively concedes,
neither Lennar nor Gerling will exhaust the underlying policy limits.  With respect to the no-evidence motion,
Lennar has presented no evidence that it or Gerling will exhaust the underling
policy limits, and, again, effectively concedes they cannot be exhausted.





[44]  American
Dynasty also asserts that each home constitutes a separate Aoccurrence.@  However, our conclusion that each home
constitutes a separate Aoccurrence@ does
not defeat coverage under the American Dynasty policy because there is an
annual $1 million limit on the amount Lennar must pay before coverage is
triggered.  Accordingly, the fact that
Lennar has not incurred damages exceeding $250,000 for any one home does not necessarily
preclude coverage under the American Dynasty policy.





[45]  Donald Klein
testified that EIFS-related property damage begins within Aa couple of months@ after a
home is completed.  Mark Williams, an
architect familiar with EIFS, averred by affidavit that in the Houston climate,
EIFS-related property damage is likely to begin shortly after construction.





[46]  Exclusion M
also applies to Aproperty damage@ to Aimpaired property.@  However, Aimpaired
property@ is defined as Atangible@ property other than Ayour
work@ that cannot be used because it incorporates Ayour work.@  Here, the homes are Lennar=s work; thus, the homes are not Aimpaired property.@





[47]  Only American
Dynasty and Markel raised the Aknown loss@ and Aloss in progress@
doctrines because their policy periods are last in line chronologically.





[48]  The letter
binding the American Dynasty policy was issued May 28, 1999.  The policy was effective June 1, 1999.  Because the time between issuance and the effective
date is negligible, we will refer to June 1, 1999 as the Apurchase@ date.





[49]  On remand, it
can be determinated which specific homes fall into this category.





[50]  The evidence
is unclear on the number of inquiries. 
At one point, Horn testified Lennar had received twelve to fourteen
inquiries as of June 1999.  At another
point, she suggested Lennar had received thirty to forty inquiries by that
time.  Regardless, Lennar received a
number of inquiries in a short time period. 






[51]  In 1996, Lennar
had learned of a class action in North Carolina against certain EIFS
manufacturers.  When Lennar inquired
about this suit, it was told the problems were unique to North Carolina and
caused by applicator error.





[52]  Ultimately,
Lennar decided to contact all homeowners and voluntarily replace EIFS.





[53]  Further, that
fact that Lennar did not stop using EIFS until late 1999 is evidence that
Lennar did not know on June 1, 1999 that EIFS would damage all the homes on
which it was applied.  





[54]  The Hernandez
court originally imposed the prejudice requirement with respect to enforcing a Asettlement-without-consent@ clause in an uninsured/underinsured motorist
policy.  See 875 S.W.2d at 692B94.  However,
the requirement has been expanded to apply to other types of insurance
policies.  See Comsys, 130 S.W.3d
at 192B93 (citing McCarthy Bros., 123 F. Supp. 2d at
379B80).





[55]  Although the
Markel policy was not issued until July 21, 1999, it was effective June 1,
1999.  Nonetheless, we will consider July
21, 1999 as the purchase date for purposes of the Aknown loss@ and Aloss in progress@
doctrines.  See Burch, 450 S.W.2d
at 841 (recognizing recovery may be had on a policy antedated to include the
time at which the loss occurred as long as the insured and the insurer did not
know of the loss when the contract was made).





[56]  Again, it can
be determined on remand which homes fall into this category.





[57]  Markel also
points to Lennar=s privilege logs on which Lennar listed several reports,
letters, and memoranda demonstrating that Lennar was internally communicating
about EIFS homes before July 21, 1999. 
However, without knowing the contents of these communications, we cannot
conclude they prove Markel=s Aknown loss@ and Aloss in progress@
defenses.





[58]  Lennar did not
notify Markel of the EIFS claims until January 28, 2000. It is undisputed that
Lennar had settled some of the claims by this date.  Further, it is undisputed that Markel did not
consent to any of the EIFS settlements.





[59]  American Dynasty
also asserts that Florida law applies to Lennar=s
extra-contractual claims.  However,
American Dynasty has not met its burden to show that Florida law differs from
Texas law on all Lennar=s extra-contractual claims.  See Weatherly, 905 S.W.2d at 650.  For instance, American Dynasty has not cited
Florida law to show that it differs from Texas law on Lennar=s common-law negligent misrepresentation claim.  Therefore, we need not engage in a choice of
law analysis on that claim and will apply Texas law.  However, Florida law necessarily differs from
Texas law on Lennar=s statutory extra-contractual claims because Lennar
asserts violations of the Texas Insurance Code. 
Nonetheless, because we ultimately conclude that the trial court
properly granted summary judgment on Lennar=s claims
under the Texas Insurance Code, we will evaluate those claims.





[60]  Ralston stated
that binding the policy was subject to American Dynasty=s receipt of (1) a completed application, (2) Lennar=s financial data, (3) a letter from Lennar confirming
an approved claims service, (4) Acurrently
valued loss data@, and (5) a schedule of all named insureds to be
covered.





[61]  The Florida
suit was abated due to this Texas suit; American Dynasty=s rescission counterclaim is still pending in this
suit because the trial court severed it.





[62]  According to
Ralston, before binding the policy, she specifically asked Pulley whether
Lennar used EIFS, and Pulley responded that Lennar did not use EIFS.  However, Pulley averred by affidavit that she
had no recollection of Ralston asking her whether Lennar used EIFS.  Nonetheless, even if they did discuss EIFS,
Ralston did not know whether Pulley had spoken with Lennar concerning EIFS
exposure; Ralston assumed that Pulley had spoken with the Aretail broker.@  Ralston could not identify what untrue
statements Lennar made regarding its use of EIFS, but Athere somewhere was a misrepresentation.@  Further,
according to Ralston, most of the time, she and Pulley spoke about ALennar Corporation@ only,
as opposed to Lennar=s subsidiaries.  Ralston also decided Lennar made untrue
statements regarding its use of EIFS based on an AUnderwriting
Risk Analysis@ performed several months after the policy=s effective date. 
The analysis reflected that ALennar
Corporation@ reported no past use of EIFS and no future plans to
use EIFS.  However, the analysis also stated
that Lennar=s numerous acquisitions of builders over the previous
years made accurate assessment of EIFS exposure unlikely, and the acquired
builders may present greater exposure to EIFS losses.  Ralston did not follow up possible EIFS
exposure for Lennar subsidiaries.





[63]  Further, the
alleged misrepresentation regarding rescission of the policy was not made for
the guidance of Lennar in its business as required to sustain a negligent
misrepresentation claim.  See Roof
Sys., Inc., 130 S.W.3d at 438. 
Instead, it was merely an allegation in a suit.  Regardless, Lennar did not prove that it
suffered any pecuniary loss as a result of relying on the alleged misrepresentation.  See id. 





[64]  Lennar
contends it was damaged by American Dynasty=s
terminating the policy because it had to replace the policy with another
policy.  Lennar contends it was damaged
by American Dynasty=s attempted rescission because it incurred legal expenses
to avoid rescission and a gap in coverage and conducted business with
uncertainty over whether it would have liability coverage for that policy
period.  Therefore, Lennar is, in effect,
complaining of damages caused by the actual termination, and attempted
rescission, as opposed to damages caused by any misrepresentations regarding
the reasons for termination and attempted rescission.  We will address Lennar=s complaints regarding the actual termination and
attempted rescission when we address its article 21.21 claims.





[65]  Article 21.21
was repealed and recodified effective April 1, 2005.  After we formally cite each section of former
article 21.21 relevant to this opinion, we will then, for ease of reference,
refer to the sections as they were previously codified in article 21.21.





[66]  Act of April
25, 1957, 55th Leg., R.S., ch. 198, '1, 1957
Tex. Gen. Laws 401, 401B06 (repealed and recodified 2003) (current version at Tex. Ins. Code Ann. ' 541.003 (Vernon Supp. 2005)).  





[67]  Act of May 10,
2001, 77th Leg., R.S., ch. 290, ' 1, 2001
Tex. Gen. Laws 548, 548B551  (repealed
and recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061
(Vernon Supp. 2005)).





[68]  Act of May 17,
1995, 74th Leg., R.S., ch. 414, '13, 1995
Tex. Gen. Laws 2988, 3000B001 (repealed and recodified 2003) (current version at
Tex. Ins. Code Ann. ' 541.151 (Vernon Supp. 2005)); see Tex. Bus. & Com. Code Ann. ' 17.46(b) (Vernon Supp. 2005).  





[69]  Lennar does
not specify which particular conduct supports which particular section.  However, we have tried to match the
particular alleged conduct with the particular section. 





[70]  Unlike a
common-law misrepresentation claim, an insured is not required to prove
reliance to maintain a claim under section 4 of article 21.21.  See Tex.
Ins. Code Ann. art. 21.21, '
16(a).  However, the insured must prove
that it sustained actual damages.  See
id.





[71]  Ralston did
not follow up on her earlier conversation with Pulley or the Aunderwriting risk analysis@ when deciding to terminate the policy.  Nevertheless, she thought she had enough
information to  terminate the policy
based on Lennar=s alleged untrue statements regarding its use of
EIFS.  Further, the claims representative
who decided to rescind the policy did not conduct his own investigation;
instead, he relied on the information provided to him by Ralston.





[72]  Further,
although article 21.21 incorporates section 17.46 of the DTPA, article 21.21
makes actionable only those deceptive acts and practices specifically defined
in section 17.46.  See Tri‑Legends,
889 S.W.2d at 441 (citing Watson, 876 S.W.2d at 149).  Wrongful termination or rescission are not
defined as deceptive acts or practices in any of the subsections of section
17.46 cited by Lennar.  See Tex. Bus. & Com. Code Ann. '' 17.46(b)(5) and (12).





[73]  Moreover, the
issue of whether American Dynasty had a reasonable basis to rescind the policy
is premature because the trial court severed American Dynasty=s rescission counterclaim from this action pending
resolution of this appeal.  This issue
will be more appropriately resolved in the rescission counterclaim.  Nonetheless, American Dynasty=s conduct with respect to attempted rescission does
not support an article 21.21 claim.





[74]  Act of May 27,
1991, 72nd Leg., R.S., ch. 242, '11.03,
1991 Tex. Gen. Laws 939, 1043B1045 (repealed and recodified 2003) (current version
at Tex. Ins. Code Ann. '' 542.051B.061
(Vernon Supp. 2005)).  Article 21.55 was
also repealed and recodified effective April 1, 2005.  We will hereafter refer to the pertinent
sections as they were previously codified in article 21.55.





[75]  As we have
discussed, Lennar did seek indemnification for its own overhead costs,
inspection costs, personnel costs, and attorneys= fees in
addition to the costs to repair the EIFS homes. 
However, we have already concluded American Dynasty has no duty to
indemnify Lennar for these costs. 
Therefore, even if these costs could constitute a first-party claim,
Lennar has no article 21.55 claim with respect to these costs.  See Allstate Ins. Co. v. Bonner,
51 S.W.3d 289, 291 (Tex. 2001) (stating that to successfully maintain a cause
of action for penalties under article 21.55, the insured must establish, among
other elements, that the insurer is liable for the claim).





[76]  We note the Hartman
court indicated that a request for a defense was not a first-party claim.  See 55 F. Supp. 2d at 603B04. However, the judge who wrote Hartman
subsequently concluded in another case that a request for a defense can be a
first-party claim.  See Travelers
Indem. Co. of Connecticut v. Presbyterian Healthcare Res., 313 F. Supp. 2d
648, 653 (N.D. Tex. 2004).  Regardless,
we find the portion of Hartman distinguishing a first-party claim from a
third-party claim is still viable although the judge later decided that a
request for a defense comes within the definition of a first-party claim.